**Nomination of Brantley Starr to the United States District Court for the
Northern District of Texas
Questions for the Record
April 17, 2019**

**<u>QUESTIONS FROM SENATOR FEINSTEIN</u>**

1.    Please respond with your views on the proper application of precedent by judges.

   **a.    When, if ever, is it appropriate for lower courts to depart from Supreme
   Court precedent?**

   Never.

   **b.    Do you believe it is proper for a district court judge to question Supreme
   Court precedent in a concurring opinion? What about a dissent?**

   Circuit judges issue concurrences and dissents addressing a great many topics, including
   the possibility that the Supreme Court could revisit one of its prior decisions.  However,
   lower courts have no authority to depart from Supreme Court precedent.

   **c.    When, in your view, is it appropriate for a district court to overturn its own
   precedent?**

   Because a district court decision is not binding, *Camreta v. Greene*, 563 U.S. 692, 709
   n.7 (2011), a district court is not bound by another district court ruling.  If it is clear that a
   prior district court ruling is incorrect, the district court is free to disagree with the prior
   holding.

   **d.    When, in your view, is it appropriate for the Supreme Court to overturn its
   own precedent?**

   Because only the Supreme Court may overrule a Supreme Court opinion, *see Rodriguez
   de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989), it would be
   inappropriate for me as a district court nominee to opine on a role unrelated to my
   nomination.

2.    When Chief Justice Roberts was before the Committee for his nomination, Senator
Specter referred to the history and precedent of *Roe v. Wade* as "super-stare decisis." A text book
on the law of judicial precedent, co-authored by Justice Neil Gorsuch, refers to *Roe v. Wade* as a
"super-precedent" because it has survived more than three dozen attempts to overturn it. (The
Law of Judicial Precedent, Thomas West, p. 802 (2016).) The book explains that
"superprecedent" is "precedent that defines the law and its requirements so effectively that it
prevents divergent holdings in later legal decisions on similar facts or induces disputants to settle
their claims without litigation." (The Law of Judicial Precedent, Thomas West, p. 802 (2016))

   **a.    Do you agree that *Roe v. Wade* is "super-stare decisis"? Do you agree it is**

**"superprecedent"?**

For a district court, all Supreme Court precedent is superprecedent in that it is binding on all district courts.  If confirmed, I would fully and faithfully apply *Roe* and its progeny.

**b.      Is it settled law?**

Please see my answer to Question 2(a).

3.      In *Obergefell v. Hodges*, the Supreme Court held that the Constitution guarantees same-sex couples the right to marry. **Is the holding in *Obergefell* settled law?**

Yes.  If confirmed, I would fully and faithfully apply *Obergefell.*

4.      In Justice Stevens's dissent in *District of Columbia v. Heller* he wrote: "The Second Amendment was adopted to protect the right of the people of each of the several States to maintain a well-regulated militia. It was a response to concerns raised during the ratification of the Constitution that the power of Congress to disarm the state militias and create a national standing army posed an intolerable threat to the sovereignty of the several States. Neither the text of the Amendment nor the arguments advanced by its proponents evidenced the slightest interest in limiting any legislature's authority to regulate private civilian uses of firearms."

**a.      Do you agree with Justice Stevens? Why or why not?**

As a district court nominee, it would be inappropriate for me to provide personal beliefs about particular Supreme Court opinions.  If confirmed, I would fully and faithfully apply binding Supreme Court and Fifth Circuit precedent.

**b.      Did *Heller* leave room for common-sense gun regulation?**

The Supreme Court found that "the right secured by the Second Amendment is not unlimited" in *Heller.* 554 U.S. 570, 626–27 (2008).  Because the constitutionality of various gun regulations is in pending litigation, Canon 3(A)(6) of the Code of Conduct for United States Judges prohibits me from commenting further.

**c.      Did *Heller*, in finding an individual right to bear arms, depart from decades of Supreme Court precedent?**

Please see answer to 4(a) above.

5.      In *Citizens United v. FEC*, the Supreme Court held that corporations have free speech rights under the First Amendment and that any attempt to limit corporations' independent political expenditures is unconstitutional. This decision opened the floodgates to unprecedented sums of dark money in the political process.

**a.      Do you believe that corporations have First Amendment rights that are equal to individuals' First Amendment rights?**

The Supreme Court has recognized that "First Amendment protection extends to corporations." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342 (2010). If confirmed, I would fully and faithfully apply this and any other binding Supreme Court and Fifth Circuit precedent. Because the exact scope of these rights is in pending litigation, Canon 3(A)(6) of the Code of Conduct for United States Judges prohibits me from commenting further.

      **b.**      **Do individuals have a First Amendment interest in not having their individual speech drowned out by wealthy corporations?**

As a district court nominee, it would be inappropriate for me to comment on policy matters in light of Canon 5 of the Code of Conduct for United States Judges. It would also be inappropriate for me to comment on a matter that could come before me, if confirmed.

      **c.**      **Do you believe corporations also have a right to freedom of religion under the First Amendment?**

The Supreme Court has recognized such a right in the limited context of closely held corporations under the Religious Freedom Restoration Act. *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2759–2760 (2014). If confirmed, I would fully and faithfully apply this and any other binding Supreme Court and Fifth Circuit precedent. Because the exact scope of this right is in pending litigation, Canon 3(A)(6) of the Code of Conduct for United States Judges prohibits me from commenting further.

6.      You were co-counsel on a brief filed in *Texas v. United States*, a challenge brought by several states against the Deferred Action for Childhood Arrivals Program, also known as DACA. You argued that DACA and "the Obama Administration's refusal to follow immigration laws caused a humanitarian crisis" by encouraging "international child smuggling across the Texas-Mexico border." (Complaint, *Texas v. United States* (2018))

**Please explain what evidence you had to come to the conclusion that DACA encouraged international child smuggling and a humanitarian crisis.**

The legal filing you reference quoted from another court opinion addressing a series of smuggling cases the court had determined were caused by various administration immigration policies. *See United States v. Nava-Martinez*, No. 1:13-cr-00441 (S.D. Tex. Dec. 13, 2013), ECF No. 37. Additional evidence was discussed on pages 26–28 of the filing. Because that matter is still pending, I cannot comment further in light of Canon 3(A)(6) of the Code of Conduct for United States Judges.

7.      In February 2018, you wrote a letter to the Chairman of the Texas Senate's Select Committee on Election Integrity. In the letter, you claimed that certain practices involving mail-in ballots were undermining the integrity of Texas's elections, and you argued that the Legislature should "examine[ ] widespread abuse of voting assistance procedures to coerce and influence voters." (Letter to the Hon. Bryan Hughes (Feb. 5, 2018))

**a.     At the time you sent this letter, what evidence did you have of widespread abuse of voting assistance procedures?**

The evidence cited in the letter was that "a brief investigative survey of four counties . . . found that over the previous 24 months, 165 unlawfully registered non-citizen voters had been removed from the voter rolls" after admitting they were not citizens at jury duty and "had cast 100 illegal votes in Texas elections prior to identifying themselves as non-citizens at jury duty and being removed from the voter rolls."  Texas has 254 counties.  The Office of the Texas Attorney General has previously disclosed that it prosecuted 33 defendants for 97 election fraud violations in 2018, and has 15 pending cases 75 pending investigations.  There is additional law enforcement data the conclusions in the letter relied on that remains privileged.

**b.     What evidence did you have that voting assistance procedures were used to coerce and influence voters?**

The law enforcement data underlying that particular reference remains privileged.

8.     On January 25, 2019, Acting Texas Secretary of State David Whitley announced that his office had developed a list of nearly 100,000 registered voters in the state who he claimed are not U.S. citizens.  On the same day, Attorney General Ken Paxton issued a press release stating that his office would "spare no effort in assisting with these troubling cases."  The press release also stated that the Attorney General's "Election Fraud Unit stands ready to investigate and prosecute crimes against the democratic process when needed."  (Press Release, Attorney General Ken Paxton (Jan. 25, 2019))

According to press reports, almost immediately after the Attorney General's announcement, the Texas Secretary of State's Office began informing counties that a "substantial number" of those included on the list are in fact citizens.  And more recent reporting makes clear that "[a]t least 25,000 of those individuals [on the list] were erroneously flagged [as non-citizens] because of a mix-up between the secretary of state's office and the Department of Public Safety."  (Alex Ura, *Texas counties removed 14 voters from the rolls in citizenship review*, TEXAS TRIBUNE (Mar. 15, 2019); Alex Ura, *Texas quietly informs counties that some of the 95,000 voters flagged for citizenship review don't belong on the list*, TEXAS TRIBUNE (Jan. 29, 2019))

**a.     Did you have any involvement in the development or approval of this list?  If so, please describe the nature of your involvement.**

No.

**b.     At any point prior to, during, or after the development of this list, did you have any correspondence or communication with anyone in the Texas Secretary of State's Office or the Texas Attorney General's Office regarding the list?  If so, who did you communicate or correspond with and what was the nature of that correspondence or communication?**

I had no such communication prior to the development of the list.  When the Secretary of State's office released the list to county election offices, it also released the list to the Office of the Texas Attorney General.  After litigation commenced regarding the list, the Office of the Attorney General undertook representation of the Secretary of State.  Any attorney-client or law enforcement communications are privileged.

9.      On March 28, 2019, the House Committee on Oversight and Government Reform sent a letter to Secretary Whitley requesting documents related to the development of the list of registered voters alleged to be non-citizens.  On April 11, the Office of the Texas Attorney General responded to the Committee's letter on behalf of Secretary Whitley.  The response — drafted by your immediate boss, First Assistant Attorney General Jeff Mateer — claimed that the Committee lacked jurisdiction over the matter and refused to turn over the requested documents.  (David Lee, *Texas AG Refuses House Demand for Voter-Fraud Files*, COURTHOUSE NEWS SERVICE (Apr. 11, 2019))

**What was your role in responding to the March 28, 2019 House Committee on Oversight and Government Reform letter?**

I was not involved in drafting that letter.

10.     On February 22, 2018, you testified before the Texas Senate Election Security Select Committee.  In your testimony, you stated that former Starr County District Judge Blas Chapa had voted three times after his death.  But voter records maintained by Starr County make clear that the late Judge Chapa did not vote after his death.  (Berenice Garcia, *Attorneys accuse Attorney General's office of false statements*, THE MONITOR (Apr. 5, 2018))

    a.      **Please provide the evidence that you relied on in claiming that the late Judge Blas Chapa had voted after his death.**

    I did not name the deceased individual whose ballot was allegedly voted in my legislative testimony.  The evidence relied on was a criminal complaint filed shortly before the hearing.  The specific criminal complaint remains privileged.

    b.      **What research did you do to substantiate that claim?**

    Because the criminal complaint was filed shortly before the hearing, there was insufficient time to fully investigate the veracity of the allegation before the hearing.  Instead, the Office of the Texas Attorney General made the determination to report the fact of the complaint to the committee.  I made clear in that testimony that the allegation had just been received and that "there is important work to be done."  When the Criminal Investigations Division completed its investigation, it determined that a different deceased individual's ballot was harvested and made an arrest.  AG Paxton's Election Fraud Unit Arrests Starr County Woman for Illegal Voting Using a Dead Person's Identity, Jan. 31, 2019, *at* https://www.texasattorneygeneral.gov/news/releases/ag-paxtons-election-fraud-unit-arrests-starr-county-woman-illegal-voting-using-dead-persons-identity

> **c.   When did you learn your assertion was incorrect?  What did you do to correct the record? What steps did you take to alert the Texas Senate Committee of the mistake?**
>
> The Office of the Attorney General alerted the Texas Senate Committee of the results of the investigation once the reportable event of the arrest occurred.

11.   In September of 2017, Attorney General Paxton issued a press release praising President Trump's nomination of Jeff Mateer to the Eastern District of Texas.  The release quotes you as saying the following:  "Jeff Mateer leaves a legacy of service to the State of Texas and will now extend that service to all Americans."  (Press Release on Mateer Nomination (Sept. 7, 2017))  In 2015, Mr. Mateer gave a speech in which he claimed transgender children are part of "Satan's plan."  (Chris Massie, *Trump judicial nominee said transgender children are part of 'Satan's plan,' defended 'conversion therapy'* CNN (Sept. 20, 2017)).

**At the time you spoke of Mr. Mateer's "legacy of service" to Texas, were you aware of the anti-transgender comments he had made in 2015?**

No.

12.   During a March 8, 2017 hearing before the Texas House's State Affairs Committee, you testified about a bill, H.B. 35, which would require the burial or cremation by hospital facilities of fetal remains. You stated that the law was not an undue burden on women's reproductive rights because it was not a health or medical regulation, but rather a "dignity of life law."

**Please explain how directing hospitals on regulations pertaining to a medical procedure and process is not related to health or medicine.**

That particular case is on appeal to the Fifth Circuit, and the Office of the Texas Attorney General's briefing articulates the distinction courts draw between medical health and safety regulations that require health and safety justification and dignity of life laws that cannot impose an undue burden.  Because that matter is pending, I cannot comment further in light of Canon 3(A)(6) of the Code of Conduct for United States Judges.

13.   On February 22, 2018, when speaking to the Conservative Political Action Conference (CPAC), White House Counsel Don McGahn told the audience about the Administration's interview process for judicial nominees. He said: "On the judicial piece … one of the things we interview on is their views on administrative law. And what you're seeing is the President nominating a number of people who have some experience, if not expertise, in dealing with the government, particularly the regulatory apparatus. This is different than judicial selection in past years…"

> **a.   Did anyone in this Administration, including at the White House or the Department of Justice, ever ask you about your views on any issue related to administrative law, including your "views on administrative law"? If so, by whom, what was asked, and what was your response?**

Not that I recall.

**b.      Since 2016, has anyone with or affiliated with the Federalist Society, the Heritage Foundation, or any other group, asked you about your views on any issue related to administrative law, including your "views on administrative law"? If so, by whom, what was asked, and what was your response?**

Yes.  Several lawyers I work with at the Office of the Texas Attorney General are members of the Federalist Society, and therefore are affiliated with it.  I have discussed administrative law issues with my co-workers because many of the office's cases involve administrative law.  Those conversations remain privileged.

**c.      What are your "views on administrative law"?**

My views on administrative law are that, if confirmed, I would fully and faithfully apply binding Supreme Court and Fifth Circuit precedent on administrative law or any other topic.

14.      You indicated on your Senate Questionnaire that you have been a member of the Federalist Society since 2005 and on the board of the Austin Lawyers Chapter since 2017.  The Federalist Society's "About Us" webpage explains the purpose of the organization as follows: "Law schools and the legal profession are currently strongly dominated by a form of orthodox liberal ideology which advocates a centralized and uniform society. While some members of the academic community have dissented from these views, by and large they are taught simultaneously with (and indeed as if they were) the law." It says that the Federalist Society seeks to "reorder[] priorities within the legal system to place a premium on individual liberty, traditional values, and the rule of law. It also requires restoring the recognition of the importance of these norms among lawyers, judges, law students and professors. In working to achieve these goals, the Society has created a conservative and libertarian intellectual network that extends to all levels of the legal community."

**a.      Could you please elaborate on the "form of orthodox liberal ideology which advocates a centralized and uniform society" that the Federalist Society claims dominates law schools?**

I did not draft this statement and am unfamiliar with it.  Therefore, I cannot comment on its meaning.

**b.      How exactly does the Federalist Society seek to "reorder priorities within the legal system"?**

I did not draft this statement and am unfamiliar with it.  Therefore, I cannot comment on its meaning.

**c.      What "traditional values" does the Federalist society seek to place a premium on?**

I did not draft this statement and am unfamiliar with it.  Therefore, I cannot comment on its meaning.

**d.      Have you had any contact with anyone at the Federalist Society about your possible nomination to any federal court?**

During the course of this nomination process, I have had general discussions with many members of the legal community about my nomination, including individuals involved with the Federalist Society.

15.     When is it appropriate for judges to consider legislative history in construing a statute?

As a district court judge, I would faithfully and fully apply all binding precedent from the Supreme Court and Fifth Circuit—which includes looking to legislative history when a statute is ambiguous.  *See, e.g.*, *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005).

16.     At any point during the process that led to your nomination, did you have any discussions with anyone — including, but not limited to, individuals at the White House, at the Justice Department, or any outside groups — about loyalty to President Trump? If so, please elaborate.

No.

17.     Please describe with particularity the process by which you answered these questions.

I received the questions on Wednesday, April 18, 2019.  I consulted my Senate Questionnaire and conducted limited research to draft my answers.  I shared my draft with the Department of Justice, Office of Legal Policy, which offered suggestions and comments.  I made minor revisions after receiving those suggestions.  Each answer is my own.

**Senator Josh Hawley**
**Questions for the Record**

**Brantley Starr**
**Nominee, U.S. District Court for the Northern District of Texas**


**1.      What role should the original public meaning of the Constitution's text play in courts' interpretation of its provisions?**

As a district court judge, I would fully and faithfully apply all binding precedent from the Supreme Court and Fifth Circuit—some of which looks to the original public meaning of words at the time they were enacted.

**2.      As a judge, how would you approach a case involving an issue of first impression?**

If confirmed, I would still search for binding precedent from the Supreme Court and Fifth Circuit.  If there were none, I would then search for persuasive authority from other circuits.  If there were still none, I would look to the text of the law at issue and ascribe a fair reading of the original public meaning of the enacted words.  If a textual analysis is unclear, I would assess the context of the statute, such as the former version of the law or how Congress used undefined terms in other laws.  If a contextual analysis is unclear, I would utilize the established canons of statutory interpretation.

**3.      Can you discuss how you view the role of precedent in judicial decision making, and how you as a judge would approach cases involving precedents from the Supreme Court?**

Lower court judges have no freedom to depart from binding precedent, whether or not they believe a precedent to be wrongly decided.  The Supreme Court has made clear that it alone has the power to overrule its own cases.  Likewise, a district court is powerless to overrule circuit precedent.  If confirmed as a district court nominee, I would approach a case first by carefully examining whether there is any binding precedent from the Supreme Court or the Fifth Circuit.  If so, I would fully and faithfully apply that precedent to the facts of the case at hand, regardless of any personal beliefs as to the correctness of that precedent.

**4.      In your view, what is the difference in how you approach a case as a policy maker or an advocate as opposed to how you would as a judge deciding a case?**

Federalist No. 47 describes the legislative branch as having will and the judicial branch as having judgment.  Will is the power to set policy after hearing from the public and affected entities.  Judgment is the neutral application of that policy Congress sets to the facts of the case at hand.  Accordingly, judging does not involve policy making.

Likewise, the role of a judge differs from the role of an advocate.  Both serve.  But the advocate serves the client's interests and is to zealously advance any reasonable argument on the client's

behalf.  A judge is subservient to something different: the law.  That law may be in the form of binding precedent or the text of federal law.

**5.     Are there circumstances when you believe judges should consider the policy results of their decisions when deciding a case? When might those circumstances arise?**

I have studied the process the United States Circuit Court for the District of Columbia uses for remand without vacatur in certain administrative law cases.  *See, e.g.*, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 97 (D.D.C. 2017).  The Supreme Court has also guided courts to consider whether a particular interpretation of a statute would yield absurd results.  *See, e.g.*, *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).  Finally, when considering whether to grant a preliminary injunction, a district court should consider, inter alia, whether "granting the preliminary injunction will not disserve the public interest."  *See, e.g.*, *Google, Inc. v. Hood*, 822 F.3d 212 (5th Cir. 2016) (internal quotation omitted).

Beyond these contexts, I have not encountered situations where the proper role of a court involves examining policy implications of a ruling.

**6.     What is your understanding of the Supreme Court's precedents on substantive due process?**

I am aware that the Supreme Court has, on occasion, sought to implement the liberty protections of the Constitution through the Due Process Clauses of the 14th and 5th Amendments.  The Court undertook an assessment of what is required of such rights to achieve constitutional protection in *Washington v. Glucksburg*.  Some of the Court's recognition of substantive due process rights were in, *Griswold v. Connecticut*, 381 U.S. 479 (1965) (privacy), *Loving v. Virginia*, 388 U.S. 1 (1967) (interracial marriage), *Roe v. Wade*, 410 U.S. 113 (1973) (abortion), and *Obergefell v. Hodges*, 576 U.S. ___, No. 14–556 (2015) (same-sex marriage).  If confirmed, I would fully and faithfully apply these and any other binding Supreme Court and Fifth Circuit precedents.

**Senator Dick Durbin**
**Written Questions for Brantley Starr**
**April 17, 2019**

For questions with subparts, please answer each subpart separately.

**Questions for Brantley Starr**

1.      In your questionnaire you list, as the most significant case you've handled, the *Texas v. U.S.* case involving Texas's challenge to DACA, the Deferred Action for Childhood Arrivals program.  You say in your questionnaire that you "worked on all aspects of the case, from drafting the complaint and preliminary injunction motion to arguing the preliminary injunction hearing."  Your complaint argued that the DACA program represented "unlawful executive overreach."  As you know, the district court judge in this case declined to issue a preliminary injunction on the DACA program.

      **a.      Why did you list this as your most significant litigated matter?**

      I listed this litigation as among the most significant matters in which I have participated because it involves significant and important public policy debates on protections for DREAMers and executive power.

      **b.      Is it still your position that the DACA program should be terminated?  If so, what do you believe should happen to the hundreds of thousands of young people currently in the DACA program- should they be deported?**

      Texas still maintains the position, at the direction of the Texas Attorney General, that DACA involved the executive branch rewriting immigration law.  The legal positions of a client are not necessarily the personal views of an attorney, whose duty is to zealously advance any reasonable legal argument the client has.  Regarding what would happen if the Texas Attorney General prevails, he has previously stated: "The debate over DACA as policy is a question for lawmakers, and any solution must come from Congress, as the Constitution requires."  AG Paxton: Court Finds DACA Likely Unlawful, Aug. 31, 2018, *at* https://www.texasattorneygeneral.gov/news/releases/ag-paxton-court-finds-daca-likely-unlawful

2.      **Is it correct to say, as you did in your 2018 law review article "Executive Power over Immigration," that "the president does not have the power to attach new restrictions to federal grants by executive order, because Congress chose not to attach those restrictions"?**

The Supreme Court has held that when the federal funds are flowing to states, federal restrictions on a state's acceptance of federal funds "must be set out 'unambiguously'" in the text of federal law.  *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).  If confirmed, I would fully and faithfully apply this and any other binding Supreme Court and Fifth Circuit precedent.

**Nomination of Brantley Starr, to be United States District Court Judge
for the Northern District of Texas
Questions for the Record
Submitted April 17, 2019**

## QUESTIONS FROM SENATOR COONS

1.      With respect to substantive due process, what factors do you look to when a case requires you to determine whether a right is fundamental and protected under the Fourteenth Amendment?

If confirmed, I would follow the guidance from the Supreme Court and Fifth Circuit on fundamental rights, the most recent of which the Court articulated in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015) and *Washington v. Glucksberg*, 521 U.S. 702 (1997).  I would follow not only these Fourteenth Amendment binding precedents but also any binding precedents from the Supreme Court and the Fifth Circuit.

         a.      Would you consider whether the right is expressly enumerated in the Constitution?

         Yes.

         b.      Would you consider whether the right is deeply rooted in this nation's history and tradition?  If so, what types of sources would you consult to determine whether a right is deeply rooted in this nation's history and tradition?

         Yes.  The Supreme Court set forth the analysis for whether a right is deeply rooted in the nation's history and tradition in *Washington v. Glucksberg*, 521 U.S. 702 (1997), which involves "examining our Nation's history, legal traditions, and practices." The Court in *Glucksberg* examined historical practice under the common law, the practice in the American colonies, judicial decisions, the history of state statutes, and long-held traditions.

         c.      Would you consider whether the right has previously been recognized by Supreme Court or circuit precedent?  What about the precedent of a court of appeals?

         Yes.  I would be bound by decisions from the Supreme Court and Fifth Circuit that have not been overturned.  In the absence of binding precedent, I would look to decisions from other circuits as persuasive authority.

         d.      Would you consider whether a similar right has previously been recognized by Supreme Court or circuit precedent?  What about whether a similar right had been recognized by Supreme Court or circuit precedent?

         Yes.  I would consider whether the Supreme Court or a circuit court had recognized a similar right.

e.      Would you consider whether the right is central to "the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life"? *See Planned Parenthood v. Casey*, 505 U.S. 833, 581 (1992); *Lawrence v. Texas*, 539 U.S. 558, 574 (2003) (quoting *Casey*).

Yes.  I would fully and faithfully apply *Casey* and *Lawrence* and any other binding Supreme Court and Fifth Circuit precedent if confirmed.

f.      What other factors would you consider?

I would consider any other factors the Supreme Court and Fifth Circuit have determined to be relevant.

2.      Does the Fourteenth Amendment's promise of "equal protection" guarantee equality across race and gender, or does it only require racial equality?

The Supreme Court has long held the Equal Protection Clause to apply to both race and gender.  *See, e.g.*, *United States v. Virginia*, 518 U.S. 515 (1996); *Craig v. Boren*, 429 U.S. 190 (1976); *Reed v. Reed*, 404 U.S. 71 (1971).

a.      If you conclude that it does require gender equality under the law, how do you respond to the argument that the Fourteenth Amendment was passed to address certain forms of racial inequality during Reconstruction, and thus was not intended to create a new protection against gender discrimination?

Academic debate would not hinder me fully and faithfully applying binding Supreme Court and Fifth Circuit precedent, if confirmed.

b.      If you conclude that the Fourteenth Amendment has always required equal treatment of men and women, as some originalists contend, why was it not until 1996, in *United States v. Virginia*, 518 U.S. 515 (1996), that states were required to provide the same educational opportunities to men and women?

I am unsure why *United States v. Virginia* was filed when it was and not earlier.

c.      Does the Fourteenth Amendment require that states treat gay and lesbian couples the same as heterosexual couples?  Why or why not?

The Supreme Court has made clear that the Fourteenth Amendment requires same-sex couples to have the right to marriage "on the same terms as accorded to couples of the opposite sex."  *Obergefell*, 135 S. Ct. at 2607.

d.      Does the Fourteenth Amendment require that states treat transgender people the same as those who are not transgender?  Why or why not?

Equality under the law is a vital element of our legal system.  But because this issue is in pending litigation, Canon 3(A)(6) of the Code of Conduct for United States Judges prohibits me from commenting on this question.

3.    Do you agree that there is a constitutional right to privacy that protects a woman's right to use contraceptives?

The Supreme Court determined there is such a right in *Griswold v. Connecticut*, 381 U.S. 479 (1965).  If confirmed, I would apply this and all other binding Supreme Court and Fifth Circuit precedents fully and faithfully.

a.    Do you agree that there is a constitutional right to privacy that protects a woman's right to obtain an abortion?

The Supreme Court determined there is such a right in *Roe v. Wade*, 410 U.S. 113 (1973), *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), and *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016).  If confirmed, I would apply these and all other binding Supreme Court and Fifth Circuit precedents fully and faithfully.

b.    Do you agree that there is a constitutional right to privacy that protects intimate relations between two consenting adults, regardless of their sexes or genders?

The Supreme Court determined there is such a right in *Lawrence v. Texas*, 539 U.S. 558 (2003).  If confirmed, I would apply this and all other binding Supreme Court and Fifth Circuit precedents fully and faithfully.

c.    If you do not agree with any of the above, please explain whether these rights are protected or not and which constitutional rights or provisions encompass them.

Not applicable.

4.    In *United States v. Virginia*, 518 U.S. 515, 536 (1996), the Court explained that in 1839, when the Virginia Military Institute was established, "[h]igher education at the time was considered dangerous for women," a view widely rejected today.  In *Obergefell v. Hodges*, 135 S. Ct. 2584, 2600-01 (2015), the Court reasoned, "As all parties agree, many same-sex couples provide loving and nurturing homes to their children, whether biological or adopted.  And hundreds of thousands of children are presently being raised by such couples. . . .  Excluding same-sex couples from marriage thus conflicts with a central premise of the right to marry.  Without the recognition, stability, and predictability marriage offers, their children suffer the stigma of knowing their families are somehow lesser."  This conclusion rejects arguments made by campaigns to prohibit same-sex marriage based on the purported negative impact of such marriages on children.

a.    When is it appropriate to consider evidence that sheds light on our changing understanding of society?

3

If confirmed, I would follow all the Supreme Court and Fifth Circuit's binding precedents concerning the proper role of categories of evidence in various disputes that may come before me.

     b.     What is the role of sociology, scientific evidence, and data in judicial analysis?

The role of sociology, scientific evidence, and data depends on the particular issue within a particular case.  If confirmed, I would follow all the Supreme Court and Fifth Circuit's binding precedents to determine the proper role of such evidence in any dispute that may come before me.

5.     In the Supreme Court's *Obergefell* opinion, Justice Kennedy explained, "If rights were defined by who exercised them in the past, then received practices could serve as their own continued justification and new groups could not invoke rights once denied.  This Court has rejected that approach, both with respect to the right to marry and the rights of gays and lesbians."

     a.     Do you agree that after *Obergefell*, history and tradition should not limit the rights afforded to LGBT individuals?

If confirmed, I would fully and faithfully apply *Obergefell* and any other binding Supreme Court or Fifth Circuit precedent.

     b.     When is it appropriate to apply Justice Kennedy's formulation of substantive due process?

Please see answer to Question 5(a) above.

6.     You are a member of the Federalist Society, a group whose members often advocate an "originalist" interpretation of the Constitution.

     a.     In his opinion for the unanimous Court in *Brown v. Board of Education*, 347 U.S. 483 (1954), Chief Justice Warren wrote that although the "circumstances surrounding the adoption of the Fourteenth Amendment in 1868 . . . cast some light" on the amendment's original meaning, "it is not enough to resolve the problem with which we are faced.  At best, they are inconclusive . . . .  We must consider public education in the light of its full development and its present place in American life throughout the Nation.  Only in this way can it be determined if segregation in public schools deprives these plaintiffs of the equal protection of the laws."  347 U.S. at 489, 490-93.  Do you consider *Brown* to be consistent with originalism even though the Court in *Brown* explicitly rejected the notion that the original meaning of the Fourteenth Amendment was dispositive or even conclusively supportive?

Scholars have debated this point for decades.  *See, e.g.*, Michael McConnell, *The Originalist Case for* Brown v. Board of Education, 19 HARV. J. L. & PUB. POL'Y 457

(1995).  If confirmed, I would fully and faithfully apply binding Supreme Court and Fifth Circuit precedent regardless of scholarly debate.

b.      How do you respond to the criticism of originalism that terms like "'the freedom of speech,' 'equal protection,' and 'due process of law' are not precise or self-defining"? Robert Post & Reva Siegel, *Democratic Constitutionalism*, National Constitution Center, https://constitutioncenter.org/interactive-constitution/white-papers/democratic-constitutionalism (last visited Apr. 15, 2019).

I have not read the cited paper.  I understand the Supreme Court has not abdicated its judicial role of interpreting constitutional phrases merely because of their breadth.  If confirmed, I would fully and faithfully apply binding Supreme Court and Fifth Circuit precedent regardless of the breadth of a term those precedents interpret.

c.      Should the public's understanding of a constitutional provision's meaning at the time of its adoption ever be dispositive when interpreting that constitutional provision today?

For a district court judge, a constitutional provision's original public meaning is dispositive when binding Supreme Court or Fifth Circuit precedent have held that the original public meaning is dispositive.  If confirmed, I would fully and faithfully apply binding Supreme Court and Fifth Circuit precedent.

d.      Does the public's original understanding of the scope of a constitutional provision constrain its application decades later?

Please see answer to Question 6(c) above.

e.      What sources would you employ to discern the contours of a constitutional provision?

If confirmed, I would fully and faithfully apply binding Supreme Court and Fifth Circuit precedent that identifies the proper sources to employ when interpreting a constitutional provision.

7.      In June 2015, just two days after the U.S. Supreme Court issued its opinion in *Obergefell v. Hodges*, you assisted with an opinion by Texas Attorney General Paxton about whether government officials could refuse to issue marriage licenses to same-sex couples based on their religious beliefs.  The opinion concluded that government officials "retain religious freedoms that may provide for certain accommodations of their religious objections to issuing same-sex marriage licenses – or issuing licenses at all, but the strength of any particular accommodation claim depends upon the facts."

a.      Did you participate in any planning in the Texas Attorney General's office regarding how to ensure that LGBT couples could access their constitutionally protected

right to marry if employees in the clerk's office refused to serve them because of their sexual orientation?

County clerks are independent, locally elected officials in Texas and are not under the direction or control of the Office of the Attorney General of Texas. The extent of the Office of the Texas Attorney General's involvement in that matter was in issuing the above referenced opinion that informed county clerks how they could structure their offices to ensure marriage licenses issued but individuals did not have their religious beliefs violated. I am unaware of any litigation being filed against county clerks for denials of service after the opinion issued.

b.       How should a court evaluate a claim based on an individual's religious beliefs when those beliefs conflict with generally applicable laws that protect others' fundamental rights?

It would not be appropriate for me to comment on a matter that could come before me, if confirmed. Regardless, if confirmed, I would fully and faithfully apply binding Supreme Court and Fifth Circuit precedent.

c.       When the Supreme Court struck down laws banning interracial marriage, which a majority of states had when *Loving v. Virginia*, 388 U.S. 1 (1967), was decided, some opponents of interracial marriage raised religious objections. Do you agree that government employees cannot refuse to offer marriage licenses to interracial couples on the basis of religion?

The Supreme Court generally addressed the topic in *Bob Jones University v. United States*, 461 U.S. 574 (1983), where it held that a religiously affiliated private university could lose its tax-exempt status for opposition to interracial dating. If confirmed, I would fully and faithfully apply this case and any other binding Supreme Court and Fifth Circuit precedent.

8.       In 2016, you coauthored an amicus brief in *Pidgeon v. Turner*, 538 S.W.3d 73 (Tex. 2017), which supported a group of taxpayers' challenge to the City of Houston's decision to offer employee benefits to same-sex spouses of city employees.

a.       How did you decide to file this amicus brief in opposition to providing employee benefits to same-sex spouses of Houston city employees?

The decision to file amicus briefs in the name of the Texas Attorney General rests with the Texas Attorney General.

b.       The amicus brief stated, "While the judgment in *Obergefell* is authoritative, Justice Kennedy's lengthy opinion explaining that judgment is not an addendum to the federal constitution and should not be treated by state courts as if every word of it is the preemptive law of the United States." Please indicate which portion of the *Obergefell*

opinion you would consider to be binding on you as a federal district court judge if you are confirmed.

If confirmed, I would fully and faithfully apply the entirety of *Obergefell* and any other binding Supreme Court and Fifth Circuit precedent.

      c.      Is it your view that public employers can discriminate against same-sex spouses after *Obergefell*?

In accordance with *Obergefell*'s requirement of marriage on the same terms, Texas agencies altered marriage license applications, birth certificates, death certificates, and extended benefits to same-sex spouses. If confirmed, I would fully and faithfully apply *Obergefell* and any other binding Supreme Court and Fifth Circuit precedent. Regardless, some issues in this area remain pending in litigation, and as such I cannot comment further in light of Canon 3(A)(6) of the Code of Conduct for United States Judges.

9.      In your article entitled "Executive Power Over Immigration," which was published last year in the *Texas Review of Law & Politics*, you stated that President Trump's travel ban was "a facially neutral order. The order did not discriminate. It did not say that Muslims cannot come into the country because they are Muslim."

      a.      Is it relevant that President Trump, as a candidate, called for a "total and complete shutdown of Muslims entering the United States"?

The Supreme Court addressed this issue in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018). If confirmed, I would fully and faithfully apply this case and any other binding Supreme Court and Fifth Circuit precedent.

      b.      Do you believe that an executive order could discriminate against a religious group without specifically mentioning that group in the order?

It would not be appropriate for me to comment on a matter that could come before me, if confirmed. Regardless, if confirmed, I would fully and faithfully apply binding Supreme Court and Fifth Circuit precedent.

      c.      If you are confirmed, what information would you rely upon when considering if a reasonable observer would determine that a government action was taken for the purpose of disfavoring one religion?

If confirmed, I would rely on the categories of information dictated by binding precedent from the Supreme Court and the Fifth Circuit and would allocate to those categories the weight the binding precedent indicates they are entitled to.

10.      In your Senate Judiciary Committee Questionnaire, you listed "facilitating speeches and debates by assisting the Austin Lawyers Chapter of the Federalist Society" as pro bono work. At

any point in your legal career, including as a law student, have you provided free legal services to low-income clients?

Yes.  As a law student, I spent an entire summer in India investigating and prosecuting cases of bonded labor, an economic form of slavery.  My teammate and I successfully achieved a release in approximately 40 cases for clients who could not pay for legal services.  As you know, serving the public full time does not allow for pro bono representation.  During my time in private practice, I served a number of low-income clients in matters that that did not proceed to litigation and accordingly did not warrant the opening of a matter.

**<u>Questions for the Record for Brantley Starr</u>**
**<u>From Senator Mazie K. Hirono</u>**

1.      As part of my responsibility as a member of the Senate Judiciary Committee and to ensure the fitness of nominees, I am asking nominees to answer the following two questions:

**a.      Since you became a legal adult, have you ever made unwanted requests for sexual favors, or committed any verbal or physical harassment or assault of a sexual nature?**

No.

**b.      Have you ever faced discipline, or entered into a settlement related to this kind of conduct?**
**c.**
No.

2.      In your Senate Judiciary Questionnaire, you were asked to describe what pro bono work you have done to fulfill the responsibilities under Canon 2 of the American Bar Association's Code of Professional Responsibility, which calls for "every lawyer, regardless of professional prominence or professional workload, to find some time to participate in serving the disadvantaged." In response, you wrote, "I also serve the legal community through speeches, debates, and panel discussions as well as facilitating speeches and debates by assisting the Austin Lawyers Chapter of the Federalist Society."

**a.      Please explain how assisting the Federalist Society in speeches, debates, and panel discussions constitutes pro bono work that "serv[es] the disadvantaged"?**
Nominees have a long history of including information in response to Question 25 of the Senate Judiciary Questionnaire activities that contribute to the legal community, such as unpaid CLE speaking events or mentoring of law students.  This is especially true for government lawyers, whose employment precludes them from representing other clients. I have a strong desire to serve both the public and the disadvantaged.  For example, as a law student, I spent an entire summer in India investigating and prosecuting cases of bonded labor, an economic form of slavery.  My teammate and I successfully achieved a release in approximately 40 cases for clients who could not pay for legal services.  In my current government role, I serve as the liaison to the Texas Supreme Court, which includes a partnership where the Office of the Attorney General contributes up to $50 million every biennium to fund legal services for the poor.  If confirmed, I would encourage the lawyers who appear before me to do pro bono work.

**b.      Is it your view that activities, such as giving speeches and participating in debates, constitute pro bono work, if you do not receive payment for those activities?**

Please see my answer to Question 2(a).

3.      You have defended several voting laws that have been challenged as racially discriminatory. For example, in *Abbott v. Veasey*, you defended a Texas voter ID law that a federal district court judge found was enacted with discriminatory intent and had a discriminatory impact on African-American and Latino voters. After the Supreme Court's decision in *Shelby County v. Holder*, which gutted Section 5 of the Voting Rights Act, many states passed laws suppressing voting rights, particularly those of minorities. They claimed they are going after voter fraud. But voter fraud is actually incredibly rare – a recent study found that between 2000 and 2014, there were only 31 credible allegations of voter impersonation – the type of fraud that photo IDs could prevent – during a period of time in which over 1 billion ballots were cast.

     **a.      Do you believe that even if there is no significant evidence of voter fraud, voter ID laws are valid as a prophylactic measure?**

     The courts have established balancing tests for when laws that impose some burden on the right to vote may be nonetheless justified.  If confirmed, I would fully and faithfully apply binding Supreme Court and Fifth Circuit precedent.  But it would not be appropriate for me to comment on a matter that could come before me, if confirmed.

     **b.      To determine whether a voting law is discriminatory, do you believe it is important to look at the context in which the law was passed and the impact that the law has?**

     The Supreme Court has made clear in *Thornburg v. Gingles* that Congressional amendments to Section 2 of the Voting Rights Act repudiated the Court's prior rulings that Section 2 only applies to discriminatory purpose claims.  478 U.S. 30 (1986).  As such, the Voting Rights Act allows for discriminatory effects claims.  If confirmed, I would fully and faithfully follow this and any other binding precedent from the Supreme Court and Fifth Circuit.

4.      In 2016, you were involved in a lawsuit brought by Texas and several other states challenging guidance from the Justice Department and the Education Department that informed schools that they should treat a student's gender identity as the student's sex for the purposes of Title IX. In speaking with a reporter about this guidance supporting transgender students, you claimed that "[t]he concerns we've always heard are related to safety." You also stated that the government's guidance made decisions that "had always been made at a local level with school officials taking appropriate steps to understand the facts about each particular situation with a general understanding about how bathrooms work."

     **a.      Please explain how a transgender child using a bathroom based on the child's gender identity creates safety concerns. Have any of those concerns been supported by fact-based evidence?**

     The litigation you reference was based upon whether federal agencies had lawful authority to define "sex discrimination" in a way that Congress rejected.  The litigation was not

predicated on safety. In an interview the Attorney General asked me to participate in, I fielded a question about what concerns we had heard. I answered the question and then turned to the legal basis for the lawsuit. Because the lawsuit did not address safety, I am not in a position to answer the question.

**b.      Please explain why it is necessary to make a case-by-case decision to determine whether a transgender child should be able to a bathroom that aligns with the child's gender identity?**
I did not say that it was necessary to make a case-by-case decision. Rather, I stated the truism that these situations had been handled locally in Texas and the lawsuit contended that the federal guidance was incongruent with federal law. That lawsuit prevailed.

**c.      Is it your view that schools should be able to decide its compliance with anti-discrimination provisions at a local level and that it is improper for the federal government to provide guidance at a national level?**

My personal views are immaterial because, if confirmed, I would follow binding precedent from the Supreme Court and Fifth Circuit. In any event, the lawsuit never contended that Congress has no power to regulate discrimination. On the contrary, it acknowledged the validity of federal anti-discrimination law in Title IX and simply argued that the federal guidance rewrote it. Those legal arguments prevailed.

4.      In 2016, you were involved in an amicus brief in case, *Pidgeon v. Turner*, which challenged the city of Houston's decision to offer employee benefits to same-sex spouses of city employees that were legally married in other states. You argued that "*Obergefell*'s judgment does not include a command that public employers like the City of Houston take steps beyond recognizing same-sex marriage - steps like subsidizing same-sex marriages (through the allocation of employee benefits) on the same terms as traditional marriages."

**Is it your view that the right of same-sex couples to marry, which was recognized in *Obergefell v. Hodges*, is limited to solely the act of marriage but not to equal treatment, such as equal benefits, under the law?**

No. In accordance with *Obergefell*'s requirement of marriage on the same terms, Texas agencies altered marriage license applications, birth certificates, death certificates, and extended benefits to same-sex spouses. If confirmed, I would fully and faithfully apply *Obergefell* and any other binding Supreme Court and Fifth Circuit precedent. Regardless, some issues in this area remain pending in litigation, and as such I cannot comment further in light of Canon 3(A)(6) of the Code of Conduct for United States Judges.

5.      You have previously testified in the Texas state legislature in support of state bills that would restrict a woman's ability to exercise her constitutional rights recognized in *Roe v. Wade* and related Supreme Court precedent. For example, in March 2017, you testified in support of a Texas bill that would require medical facilities to cremate or bury fetal remains in the event of a miscarriage or abortion. To defend the bill, you appeared to argue that the Supreme Court's

precedent in *Whole Woman's Health v. Hellerstedt* should be interpreted narrowly to apply only to medical or health regulations.

**Is it your view that other Supreme Court cases such as *Roe v. Wade* that affirmed a woman's constitutional right to an abortion should be interpreted narrowly?**

That particular case is on appeal to the Fifth Circuit, and the Office of the Attorney General's briefing articulates the distinction courts draw between medical health and safety regulations that require health and safety justification and dignity of life laws that cannot impose an undue burden. Because that matter is pending, I cannot comment further in light of Canon 3(A)(6) of the Code of Conduct for United States Judges. However, if confirmed, I would fully and faithfully apply *Roe* and any other binding Supreme Court and Fifth Circuit precedent.

6.     In *Texas v. United States*, you represented Texas in challenging the government's Deferred Action for Childhood Arrivals (DACA) program. In the complaint, you claimed that the "Obama Administration's [r]efusal to [f]ollow [i]mmigration [l]aws [c]aused a [h]umanitarian [c]risis" and that the DACA policy "encouraged international child smuggling across the Texas-Mexico border."

> **a.     Is it still your view that the government's decision to not deport certain undocumented youth who came to the United States as children "caused" a humanitarian crises?**
>
> The views expressed in the legal filings in that case are the views of my client, the Texas Attorney General. The legal filing you reference quoted from another court opinion addressing a series of smuggling cases the court had determined were caused by various administration immigration policies. *See United States v. Nava-Martinez*, No. 1:13-cr-00441 (S.D. Tex. Dec. 13, 2013), ECF No. 37. Additional evidence was discussed on pages 26–28 of the filing. Because that matter is still pending, I cannot comment further in light of Canon 3(A)(6) of the Code of Conduct for United States Judges.
>
> **b.     Given you involvement challenging the lawfulness of the DACA program, will you recuse yourself from any cases involving this issue, if you are confirmed?**
>
> The recusal statute requires a federal judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Subsection (b) then lists additional grounds for recusal, including a specific provision for government attorneys. If confirmed, I would absolutely recuse myself from any case that I have worked on, and I would scrupulously apply the recusal statute, any precedents interpreting it, and any applicable canons of judicial ethics to other matters.

**Nomination of Brantley David Starr**
**United States District Court for the Northern District of Texas Questions for the Record**
**Submitted April 17, 2019**
**QUESTIONS FROM SENATOR BOOKER**

1.      You assisted with the petition for a Writ of Certiorari in *Abbott v. Veasey*, which involved a strict voter ID law in Texas. The plaintiffs in the case argued that the voter ID law "(1) is a poll tax; (2) purposefully abridges the right to vote on account of race; (3) results in the abridgement of the right to vote on account of race, in violation of §2 of the Voting Rights Act; and (4) unconstitutionally burdens the right to vote."[1]

The cert petition argued that "plaintiffs presented no evidence that the law resulted in diminished minority political participation or prevented even a single person from voting."[2] The petition further contended that "a statistical disparity in rates of ID possession is not a disproportionate 'result' prohibited by §2."[3] It went on to argue that "[a]ny voting requirement imposes a marginally greater burden on poorer voters than more affluent voters because costs—whether measured in time, effort, or money— generally weigh more heavily on poorer voters. Yet most voting practices are legitimate and uncontroversial despite their marginal burdens."[4]

        a.      Do you believe our democracy is stronger when more eligible voters participate or is it your belief that our democracy is weakened by lower participation?

        This question involves a political matter that Canon 5 of the Code of Conduct for United States Judges prohibits me from commenting on.

        b.      Harvard Law School's Institute for Race & Justice looked at voter ID requirements and found that "the expenses for documentation, travel, and waiting time are significant— especially for minority group and low-income voters— typically ranging from about $75 to $175."[5] Did you believe $75 to $175 constitutes a "marginal burden" on poorer voters?

        My primary role in Texas's voter ID litigation involved crafting a court-ordered remedy of a reasonable impediment affidavit and advising the Texas Legislature as it codified a reasonable impediment affidavit.  My work did not involve assessing whether evidence not at issue in the Texas litigation constitutes an impermissible burden.  And because voter ID litigation remains pending in federal court, I am prohibited from commenting on this issue because of Canon 3(a)(6) of the Code of Conduct for United States Judges.

---

[1] Petition for a Writ of Certiorari, 2016 WL 5390670 at *4.

[2] *Id.* at *10.

[3] *Id.* at *19.

[4] *Id.* at *26.

[5] Richard Sobel, The High Cost of 'Free' Photo Voter Identification Cards 2 (June 2014), https://today.law.harvard.edu/wp-content/uploads/2014/06/FullReportVoterIDJune20141.pdf.

c.      The 24th Amendment to the Constitution banned poll taxes in 1964.[6] At that time, poll taxes were $1.50, which equates to $12.34 today.[7] Why did you consider costs associated with voter ID laws "marginal" when the drafters of the 24th Amendment thought $1.50 to be too burdensome?

The Fifth Circuit concluded that Texas's voter ID law was legally permissible, and the challengers did not file a cert petition from that judgment.

d.      Do you believe voter ID laws—and the costs associated with those laws—are in keeping with the spirit of the 24th Amendment?

Because voter ID litigation remains pending in federal court, I am prohibited from commenting on this issue because of Canon 3(a)(6) of the Code of Conduct for United States Judges.  However, if confirmed as a district court judge, I would faithfully and fully apply all binding precedent, as well as the law if no precedent exists, to any case before me.

e.      A recent study looked at the empirical consequences of voter ID laws and found that "strict voter identification laws do, in fact, substantially alter the makeup of who votes and ultimately do skew democracy in favor of whites and those on the political right."[8] Would this information alter the arguments you made in the *Abbott* cert petition? If not, please explain why.

The exhaustive record before the Fifth Circuit caused it to conclude that Texas's voter ID law is lawful, and the challengers did not file a cert petition.

2.      On February 5, 2018, as Deputy First Assistant Attorney General, you sent a letter to Bryan Hughes, Chairman of the Texas Senate's Select Committee on Election Integrity, regarding "Issues Related to Interim Charges on Election Integrity."[9] In the letter you wrote, "Media reports of illegal voting and the widespread practice of seeding and harvesting mail ballots, together with recent prosecutions and investigations conducted by this office, have confirmed that the threat to election integrity in Texas is real, and the need to provide additional safeguards is increasing."[10] You also wrote about a 2017 case in which the Criminal Prosecutions Division of the Office of the

---

[6] U.S. Const. amend. XXIV.

[7] Sobel, *supra* note 5, at 2; CPI Inflation Calculator, https://data.bls.gov/cgi-bin/cpicalc.pl (last visited Apr. 16, 2019).

[8] Zoltan Hajnal *et al.*, Voter Identification Laws and Suppression of Minority Votes (Jan. 2017), http://pages.ucsd.edu/~zhajnal/page5/documents/voterIDhajnaletal.pdf.

[9] Letter from Staff to Hon. Bryan Hughes, Chair, Senate Select Committee on Election Integrity, re: Issues Related to Interim Charges on Election Integrity (Feb. 5, 2018) (SJQ Attachment 12(b) at pp. 18-20).

[10] *Id.* at 18.

Attorney General successfully prosecuted a noncitizen who had voted illegally. You wrote, "This case highlighted the lack of safeguards in the system to detect ineligible voters. . . . The OAG is unable to determine the scope of non-citizen voting across Texas, from the non-citizen jury numbers alone, but it appears to be a significant problem nonetheless."

      a.     When you wrote that letter what data did you rely on in coming to the conclusion that the "threat to election integrity in Texas is real"?

The evidence cited in the letter was that "a brief investigative survey of four counties . . . found that over the previous 24 months, 165 unlawfully registered non-citizen voters had been removed from the voter rolls" after admitting they were not citizens at jury duty and "had cast 100 illegal votes in Texas elections prior to identifying themselves as non-citizens at jury duty and being removed from the voter rolls."  Texas has 254 counties.  There is additional law enforcement data the conclusions in the letter relied on that remains privileged.

      b.     Since *Shelby County, Alabama v. Holder*, states across the country have adopted restrictive voting laws that make it harder, not easier for people to vote. From strict voter ID laws to the elimination of early voting, these laws almost always have a disproportionate impact on poor minority communities. These laws are often passed under the guise of widespread voter fraud. However, study after study has demonstrated that widespread voter fraud is a myth. In fact, an American is more likely to be struck by lightning than to impersonate someone voter at the polls.[11] One study that examined over one billion ballots cast between 2000 and 2014, found only 31 credible instances of voter fraud.[12] Were you aware of those statistics when you wrote that letter? If not, now that you are aware, do those statistics change your views on whether or not voter fraud is pervasive? If not, why not?

The Office of the Texas Attorney General has previously disclosed that it prosecuted 33 defendants for 97 election fraud violations in 2018, and has 15 pending cases 75 pending investigations.  The assessment of the Office of the Texas Attorney General I relayed in my letter was based on this and internal, undisclosed law enforcement data.

      c.     The letter noted that the Office of the Attorney General of Texas was "unable to determine the scope of non-citizen voting across Texas . . . but it appears to be a significant problem nonetheless." Besides the 2017 case, what specific evidence was your office aware of that made you believe that noncitizen voting was a "significant problem"?

---

[11] Justin Levitt, The Truth About Voted Fraud, Brennan Center for Justice 6 (2007), available at http://www.brennancenter.org/sites/default/files/legacy/The%20Truth%20About%20Voter%20Fraud.pdf.

[12] Justin Levitt, *A Comprehensive Investigation of Voter Impersonation Finds 31 Credible Incidents out of One Billion Ballots Cast*, Wash. Post, Aug. 6, 2014, *available at* https://www.washingtonpost.com/news/wonk/wp/2014/08/06/a-comprehensive-investigation-of-voter- impersonation-finds-31-credible-incidents-out-of-one-billion-ballots-cast/?utm_term=.4da3c22d7dca.

Please see my answers to Question 2(a) and Question 2(b).

d.      In your petition for a Writ of Certiorari in *Abbott v. Veasey*, you argued that the "plaintiffs presented no evidence that the law resulted in diminished minority political participation or prevented even a single person from voting."[13] According to your February 5, 2018 letter, the Office of the Attorney General of Texas was "unable to determine the scope of non-citizen voting across Texas" yet you labeled it a "significant problem." In other words, you were unable to present evidence—aside, perhaps, from the lone 2017 case—that noncitizen voting was a significant problem.

>    i.      Why would you advocate for additional legislation to prevent noncitizen voting when you are unable to determine the scope of the problem in the first place?
>
>    The letter in question did not advocate for legislation.  It addressed areas of prosecutorial concern without suggesting any specific policy change.  To the extent this question asks about the wisdom or motivation of any policy change, it involves a political matter that Canon 5 of the Code of Conduct for United States Judges prohibits me from commenting on.
>
>    ii.     Why were existing safeguards not sufficient to prevent widespread noncitizen voting?
>
>    This question involves a political matter that Canon 5 of the Code of Conduct for United States Judges prohibits me from commenting on.
>
>    iii.    Do you believe that one instance of noncitizen voting is enough to justify legislative activity on the matter?
>
>    This question involves a political matter that Canon 5 of the Code of Conduct for United States Judges prohibits me from commenting on and also would require me to prejudge a case that could come before me, if confirmed.

3.      On April 15, 2015, you testified before the Texas House of Representatives Juvenile Justice and Family Issues Committee on behalf of the Office of the Attorney General of Texas.[14] You testified in support of the Hope for Orphans and Minors Expansion Act, a bill that would prohibit the state from taking "adverse action" against child welfare providers that receive taxpayer dollars and act based on sincerely held religious beliefs.[15] You argued that the Religious Freedom

---

[13] Writ of Certiorari, *supra* note 1, at *10.

[14] Testimony on behalf of the Office of the Texas Attorney General before the Texas House of Representatives Juvenile Justice & Family Issues Committee (Apr. 15, 2015), video available at http://tlcsenate.granicus.com/MediaPlayer.php?clip_id=13137 at 35:15.

[15] *Id.*

Restoration Act provides judges with too much discretion because they could determine that protecting the rights of same-sex couples could constitute a compelling government interest that outweighs the religious beliefs of child welfare providers who receive government funds.[16]

    a.     At the time of your testimony, did you believe that the government—state or federal—has a compelling interest in eradicating discrimination?

    Any personal beliefs I had regarding this topic were irrelevant at the time of the legislative hearing in question because I only testified on behalf of the Office of the Texas Attorney General.  Likewise, any personal beliefs I have now regarding this topic would be immaterial because I would set them aside as a district judge and would fully and faithfully apply all binding precedent, as well as the law if no precedent exists, to any case before me. To the extent this issue could come before me as a district judge, it would be inappropriate for me to comment on.

    b.     Do you believe that the government has a compelling interest in eradicating discrimination against LGBT people?

    Please see my answer to Question 3(a) above.

4.     Do you consider yourself an originalist? If so, what do you understand originalism to mean?

As a district court judge, I would fully and faithfully apply all binding precedent from the Supreme Court and Fifth Circuit—some of which looks to the original public meaning of words at the time they were enacted.

5.     Do you consider yourself a textualist? If so, what do you understand textualism to mean?

As a district court judge, I would fully and faithfully apply all binding precedent from the Supreme Court and Fifth Circuit—some of which looks to the public meaning of enacted words.

6.     Legislative history refers to the record Congress produces during the process of passing a bill into law, such as detailed reports by congressional committees about a pending bill or statements by key congressional leaders while a law was being drafted. The basic idea is that by consulting these documents, a judge can get a clearer view about Congress's intent. Most federal judges are willing to consider legislative history in analyzing a statute, and the Supreme Court continues to cite legislative history.

    a.     If you are confirmed to serve on the federal bench, would you be willing to consult and cite legislative history?

    As a district court judge, I would fully and faithfully apply all binding precedent from the Supreme Court and Fifth Circuit—which includes looking to legislative history when a statute is ambiguous.  *See, e.g.*, *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546,

---

[16] *Id.*

568 (2005).

     b.     If you are confirmed to serve on the federal bench, your opinions would be subject to review by the Supreme Court.  Most Supreme Court Justices are willing to consider legislative history.  Isn't it reasonable for you, as a lower-court judge, to evaluate any relevant arguments about legislative history in a case that comes before you?

Please see my answer to Question 6(a) above.

7.     According to a Brookings Institution study, blacks and whites use drugs at similar rates, yet blacks are 3.6 times more likely to be arrested for selling drugs and 2.5 times more likely to be arrested for possessing drugs than their white peers.[17] Notably, the same study found that whites are actually *more likely* than blacks to sell drugs.[18] These shocking statistics are reflected in our nation's prisons and jails. Blacks are five times more likely than whites to be incarcerated in state prisons.[19] In my home state of New Jersey, the disparity between blacks and whites in the state prison systems is greater than 10 to 1.[20]

     a.     Do you believe people of color are disproportionately represented in our nation's jails and prisons?

I am aware of studies confirming that the percentage of people of color who are incarcerated is higher than the percentage of people of color in the total population.

     b.     Prior to your nomination, have you ever studied the issue of implicit racial bias in our criminal justice system?  Please list what books, articles, or reports you have reviewed on this topic.

I have attended the training on implicit bias that the Texas judiciary offers new state judges.

     c.     According to a report by the United States Sentencing Commission, black men who commit the same crimes as white men receive federal prison sentences that are an average of 19.1 percent longer.[21] Why do you think that is the case?

---

[17] Jonathan Rothwell, *How the War on Drugs Damages Black Social Mobility*, BROOKINGS INST. (Sept. 30, 2014), https://www.brookings.edu/blog/social-mobility-memos/2014/09/30/how-the-war-on-drugs-damages-black-social-mobility.

[18] *Id.*

[19] Ashley Nellis, *The Color of Justice: Racial and Ethnic Disparity in State Prisons*, SENTENCING PROJECT (June 14, 2016), http://www.sentencingproject.org/publications/color-of-justice-racial-and-ethnic-disparity-in-state-prisons.

[20] *Id.*

[21] U.S. Sentencing Comm'n, Demographic Differences in Sentencing: An Update to the 2012 *Booker* Report 2 (Nov. 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-

I am not familiar with this particular statistic and am not in a position to speculate on the cause. However, if confirmed, I would commit to running a courtroom and chambers free from any bias—racial or otherwise.

d.      According to an academic study, black men are 75 percent more likely than similarly situated white men to be charged with federal offenses that carry harsh mandatory minimum sentences.[22] Why do you think that is the case?

Please see my answer to Question 7(c) above.

e.      What role do you think federal district judges, who handle difficult, complex criminal cases, can play in addressing implicit racial bias in our criminal justice system?

I believe federal district judges can run their courtrooms and chambers in a manner that is free from racial bias.

8.      According to a Pew Charitable Trusts fact sheet, in the 10 states with the largest declines in their incarceration rates, crime fell by an average of 14.4 percent.[23] In the 10 states that saw the largest increase in their incarceration rates, crime decreased by an average of 8.1 percent.[24]

a.      Do you believe there is a direct link between increases in a state's incarcerated population and decreased crime rates in that state? If you believe there is a direct link, please explain your views.

I am not familiar with this particular statistic and am not in a position to speculate on the cause.

b.      Do you believe there is a direct link between decreases in a state's incarcerated population and decreased crime rates in that state? If you do not believe there is a direct link, please explain your views.

Please see answer to Question 8(b).

9.      Do you believe it is an important goal for there to be demographic diversity in the judicial branch? If not, please explain your views.

_____

publications/research- publications/2017/20171114_Demographics.pdf.

[22] Sonja B. Starr & M. Marit Rehavi, *Racial Disparity in Federal Criminal Sentences*, 122 J. Pol. Econ.1320, 1323 (2014).

[23] Fact Sheet, *National Imprisonment and Crime Rates Continue to Fall*, PEW CHARITABLE TRUSTS (Dec. 29, 2016), http://www.pewtrusts.org/en/research-and-analysis/fact-sheets/2016/12/national-imprisonment-and-crime-rates-continue-to-fall.

[24] *Id.*

Yes.

10.     Would you honor the request of a plaintiff, defendant, or witness in your courtroom, who is transgender, to be referred in accordance with their gender identity?

Yes.

11.     Do you believe that *Brown v. Board of Education*[25] was correctly decided?  If you cannot give a direct answer, please explain why and provide at least one supportive citation.

*Brown* corrected an egregious error in overturning *Plessy* and ending racial segregation.  If confirmed as a district judge, I would faithfully and fully apply *Brown* and any other binding Supreme Court or Fifth Circuit precedent.  As a district court nominee, it would be inappropriate for me to opine on the correctness of binding Supreme Court decisions.  *See* Nomination of Elena Kagan to Be an Associate Justice of the Supreme Court of the United States: Hearing Before the S. Comm. on the Judiciary, 111th Cong. 64 (2010) ("I think that in particular it would not be appropriate for me to talk about what I think about past cases, you know, to grade cases.").

12.     Do you believe that *Plessy v. Ferguson*[26] was correctly decided? If you cannot give a direct answer, please explain why and provide at least one supportive citation.

*Plessy* upheld racial segregation.  The Supreme Court made clear in *Brown* that *Plessy* was incorrectly decided.

13.     Has any official from the White House or the Department of Justice, or anyone else involved in your nomination or confirmation process, instructed or suggested that you not opine on whether any past Supreme Court decisions were correctly decided?

In preparation for my hearing before the Committee, I was offered advice with respect to how previous nominees had answered questions likely to be asked of nominees.  All answers to these questions and to the questions I was asked at my hearing are my own.

14.     President Trump has stated on Twitter: "We cannot allow all of these people to invade our Country. When somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from where they came."[27] Do you believe that immigrants, regardless of status, are entitled to due process and fair adjudication of their claims?

The Supreme Court has made clear that "the Due Process Clause applies to all 'persons' within the

_____

[25] 347 U.S. 483 (1954).

[26] 163 U.S. 537 (1896).

[27] Donald J. Trump (@realDonaldTrump), TWITTER (June 24, 2018, 8:02 A.M.), https://twitter.com/realDonaldTrump/status/1010900865602019329.

United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

**Questions for the Record from Senator Kamala D. Harris**
**Submitted April 17, 2019**
**For the Nomination of**

**Brantley Starr, to the U.S. District Court for the Northern District of Texas**

1.      In 2013, you co-authored an amicus brief in *Pidgeon v. Turner*, which supported taxpayers who challenged Houston's decision to offer employee benefits to the same-sex spouses of city employees that were legally married in other states.  Your brief argued that *Obergefell* "does not include a command that public employers like the City of Houston take steps beyond recognizing same-sex marriage—steps like subsidizing same-sex marriages (through the allocation of employee benefits) on the same terms as traditional marriages."

      a.      **Would you still describe the grant of employee benefits to same-sex spouses as a "subsidy"?**

State government in Texas pays for some of the premiums associated with insuring spouses or family members.  As such, those benefits would fit within the common meaning of the term "subsidy."

      b.      **Would you describe the grant of employee benefits to heterosexual spouses as a "subsidy"?**

Please see my answer to Question 1(a) above.

      c.      **Is it your position that *Obergefell* does not extend to all of the traditional benefits of marriage, such as spousal benefits?  If yes, please explain and provide citations.**

In accordance with *Obergefell*'s requirement of marriage on the same terms, Texas agencies altered marriage license applications, birth certificates, death certificates, and extended benefits to same-sex spouses.  If confirmed, I would fully and faithfully apply *Obergefell* and any other binding Supreme Court and Fifth Circuit precedent.  Regardless, some issues in this area remain pending in litigation, and as such I cannot comment further in light of Canon 3(A)(6) of the Code of Conduct of United States Judges.

2.      In *Abbott v. Veasey*, a group of plaintiffs challenged a Texas law that required voters to present government-issued photo IDs when voting in person.  The district court concluded that the law had a disparate impact and a discriminatory effect on African Americans and Hispanics.  In a petition for Supreme Court review, you argued that "a statistical disparity in rates of ID possession is not a disproportionate 'result' prohibited by Section 2 [of the Voting Rights Act]."

      a.      **Do you agree that statistical disparities may be probative of whether there was discriminatory intent in enacting a law?**

The Supreme Court has made clear in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266–68 (1977), that statistical evidence is relevant for a discriminatory purpose claim.  If confirmed, I would fully and faithfully apply this and any other binding Supreme Court or Fifth Circuit precedent.

      **b.**      **Do you agree that, under Section 2, courts may consider disparate impact when evaluating whether a voting law must be struck down?**

Yes.  The Supreme Court has made clear in *Thornburg v. Gingles* that Congressional amendments to Section 2 of the Voting Rights Act repudiated the Court's prior rulings that Section 2 only applies to discriminatory purpose claims.  478 U.S. 30 (1986).  If confirmed, I would fully and faithfully apply this and any other binding Supreme Court or Fifth Circuit precedent.

3.      District court judges have great discretion when it comes to sentencing defendants.  It is important that we understand your views on sentencing, with the appreciation that each case would be evaluated on its specific facts and circumstances.

      a.      **What is the process you would follow before you sentenced a defendant?**

If confirmed, I would give careful thought to every sentencing proceeding and ensure that the sentence imposed is "sufficient, but not greater than necessary, to comply with the purposes" of federal sentencing Congress established.  18 U.S.C. § 3553(a).  Accordingly, I would consult the indictment, the governing statutes, applicable Supreme Court and Fifth Circuit precedent, the presentence report of the probation officer, the advisory Sentencing Guidelines and other factors set forth in 18 U.SC. § 3553(a), the arguments and objections of the parties, and the statements of the defendant, victims, or witnesses.  I fully appreciate the magnitude of the sentencing process, and I would fully and faithfully follow the law and my judicial oath in carrying out this responsibility.

      **b.**      **As a new judge, how do you plan to determine what constitutes a fair and proportional sentence?**

Please see my answer to Question 3(a) above.

      c.      **When is it appropriate to depart from the Sentencing Guidelines?**

Supreme Court and Fifth Circuit precedent and the advisory Sentencing Guidelines explain the circumstances that can justify a departure or variance from the Guidelines.  Part K of Section 5 of the Guidelines lists specific circumstances that can justify a departure from the advisory Guidelines range.  Under Supreme Court precedent, the factors listed in 18 U.S.C. § 3553(a) may also call for varying from the advisory Guidelines range.  The Supreme Court and the Fifth Circuit have provided guidance to district courts regarding when it is appropriate to depart or vary from the advisory sentencing range.  If confirmed, I would fully and faithfully follow that precedent, the law, and my judicial oath in carrying out this solemn responsibility.

d.      Judge Danny Reeves of the Eastern District of Kentucky—who also serves on the U.S. Sentencing Commission—has stated that he believes mandatory minimum sentences are more likely to deter certain types of crime than discretionary or indeterminate sentencing.[1]

    i.      **Do you agree with Judge Reeves?**

I believe that the issue of mandatory minimum sentences in criminal statutes is a policy reserved for Congress.  As a nominee, it would be inappropriate for me to comment on policy matters in light of Canon 5 of the Code of Conduct for United States Judges.  If confirmed, I would fully and faithfully follow Supreme Court and Fifth Circuit precedent and federal sentencing laws and not be swayed by any personal opinions when sentencing.

    ii.     **Do you believe that mandatory minimum sentences have provided for a more equitable criminal justice system?**

Please see my answer to Question 3(d)(i) above.

    iii.    **Please identify instances where you thought a mandatory minimum sentence was unjustly applied to a defendant.**

Please see my answer to Question 3(d)(i) above.

    iv.     Former-Judge John Gleeson has criticized mandatory minimums in various opinions he has authored, and has taken proactive efforts to remedy unjust sentences that result from mandatory minimums.[2]  **If confirmed, and you are required to impose an unjust and disproportionate sentence, would you commit to taking proactive efforts to address the injustice, including:**

        1.      **Describing the injustice in your opinions?**

I am aware of the significant controversy and debate regarding mandatory minimum sentences.  If confirmed, I would evaluate each case individually and would carefully consider Supreme Court and Fifth Circuit precedent, the law, and my ethical obligations if confronted with the circumstances this question presents.

---

[1] https://www.judiciary.senate.gov/imo/media/doc/Reeves%20Responses%20to%20QFRs1.pdf.

[2] *See, e.g.,* "Citing Fairness, U.S. Judge Acts to Undo a Sentence He Was Forced to Impose," NY Times, July 28, 2014, https://www.nytimes.com/2014/07/29/nyregion/brooklyn-judge-acts-to-undo-long-sentence-for-francois-holloway-he-had-to-impose.html

     2.     **Reaching out to the U.S. Attorney and other federal prosecutors to discuss their charging policies?**

The power to charge individuals with crimes rests in the Executive Branch.  If confirmed, I would be bound to respect the Constitution's separation of powers.

     3.     **Reaching out to the U.S. Attorney and other federal prosecutors to discuss considerations of clemency?**

The power to grant clemency rests in the Executive Branch.  If confirmed, I would be bound to respect the Constitution's separation of powers.

   e.     28 U.S.C. Section 994(j) directs that alternatives to incarceration are "generally appropriate for first offenders not convicted of a violent or otherwise serious offense."  **If confirmed as a judge, would you commit to taking into account alternatives to incarceration?**

Yes.

4.     Judges are one of the cornerstones of our justice system.  If confirmed, you will be in a position to decide whether individuals receive fairness, justice, and due process.

   a.     **Does a judge have a role in ensuring that our justice system is a fair and equitable one?**

Yes.

   b.     **Do you believe there are racial disparities in our criminal justice system?  If so, please provide specific examples.  If not, please explain why not.**

I am aware of the studies demonstrating racial disparities at a variety of phases of our criminal justice system, specifically with regarding to arrest rates, incarceration rates, and sentencing disparities.  In a country with the clear grant of equality under the law from the Fourteenth Amendment, our criminal justice system should simply have no room to discriminate on the basis of race.  If confirmed, I will ensure that racial bias has no place in my courtroom or chambers.

5.     If confirmed as a federal judge, you will be in a position to hire staff and law clerks.

   a.     **Do you believe it is important to have a diverse staff and law clerks?**

Yes.

b.      **Would you commit to executing a plan to ensure that qualified minorities and women are given serious consideration for positions of power and/or supervisory positions?**

If confirmed, I would ensure that qualified minorities and women are given serious consideration for all positions that I am in a position to fill.