IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| VALERIE JACKSON, | § | |
|      Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:18-CV-2935-X-BH |
| | § | |
| LUPE VALDEZ, MARIAN BROWN, | § | |
| SAMUEL JOSEPH, LIZYAMMA | § | |
| SAMUEL, UNKNOWN DALLAS | § | |
| EMPLOYEE III, and DALLAS | § | |
| COUNTY, TEXAS, | § | |
|      Defendants. | § | Referred to U.S. Magistrate Judge[1] |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Before the Court is the *Motion to Dismiss Under Fed.R.Civ.P. 12(b)(6) and Brief in Support of Defendants*, filed July 22, 2019 (doc. 23).  Based on the relevant filings and applicable law, the motion should be **GRANTED**.

## I.  BACKGROUND

Valerie Jackson (Plaintiff) sues Dallas County, Texas (the County), Sheriffs Lupe Valdez and Marian Brown (Sheriffs) in their official and individual capacities, and Officers Samuel Joseph and Lizyamma Samuel (Officers) and Unknown Dallas Employee III (Nurse) in their individual capacities under 42 U.S.C. § 1983 for violations of her rights under the Fourth, Fifth, and Fourteenth Amendments of the Constitution.  (*See* doc. 18.)[2]  She seeks actual and punitive damages, exemplary damages under § 41.003(a) of the Texas Civil Practice & Remedies Code, and attorney's fees and costs of court under 42 U.S.C. § 1988. (*Id.* at 28.)

---

[1]By *Standing Order of Reference* filed January 8, 2020 (doc. 43), this case was referred for full case management.

[2]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

Plaintiff is a transgender woman who was assigned the sex of male at birth, and had her gender legally changed to female. (doc. 18 at 3.) On November 4, 2016, she was arrested for unlawful possession of a weapon and taken to the Dallas County jail. (*Id.*) During the booking process, officers asked her "all the standard intake questions," and after verifying her name and gender from her driver's license, they gave her a wristband that identified her gender as female. (*Id.*) They took Plaintiff to an enclosed corner and ordered her to lift up her shirt and bra to expose her bare breasts, and she complied. (*Id.*) She was then escorted to a male nurse for a medical assessment, during which she was asked questions that led her to reveal that she was a transgender woman. (*Id.* at 3-4.) When the nurse asked why the paperwork listed her as a female, she explained that she was a female. (*Id.* at 4.) The nurse left the paperwork the way it was filled out and concluded the medical assessment. (*Id.*) When Plaintiff returned to the waiting area with the other female detainees, a male officer asked her if she had a "sex change or something," and he asked in front of the other inmates whether she "had everything done even down there." (*Id.*) She "falsely told him that she had, because she wanted th[e] unnecessary and humiliating harassment to end." (*Id.* at 5.)

Officers and Nurse then took Plaintiff back to the enclosed corner and instructed her to pull down her pants and underwear, allegedly stating:

> We need to know if you've head a sex change or not. We need to see if you have a penis or vagina. We have to protect you. We can't put you with men if you have a vagina.

(*Id.*) Plaintiff told them she was not going to pull down her underwear and that "she should not have to prove anything to them if none of the other women had to prove anything." (*Id.*) Officers responded that she was "coming up in the system as male" and "it can never be changed" no matter

what she did.  (*Id.*)  They also told her:

> [N]ow our policy is we have to verify that you've had a sex change. If you have a
> penis you're going with the men. If you have a vagina, you're going with the women.

(*Id.*)  When Plaintiff continued to protest, Officers stated that "they would transfer her to Parkland

Hospital if she refused, that [she] would have to show her genitals at Parkland Hospital, and that it

would add hours to her incarceration."  (*Id.*)  They also stated, "[T]hat's our policy. You can talk

to Lupe Valdez about it when you get out."  (*Id.* at 6.)  Plaintiff alleges that she pulled down her

underwear so Officers and Nurse "could verify her genitalia and gender" because she felt "she was

out of options and had no other choice."  (*Id.*)

After observing Plaintiff's genitals, Officers told her that she could watch TV with the men

or go into a solitary cell.  (*Id.*)  She was ultimately placed in her own cell, but male inmates

questioned her through the door about being a "tranny" or a "real girl," made sexual comments and

gestures to her, and called her derogatory names.  (*Id.* at 7.)  Plaintiff was eventually taken in a line

with male inmates to court, where she was repeatedly humiliated by loud discussions between the

officers, in front of the other inmates, about her being a man even though she looked female.  (*Id.*

at 8.)  When she was returned to the jail, Plaintiff was taken to the male locker room and instructed

to strip down and shower because "it was something everyone had to do."  (*Id.*)  A female officer

intervened and took her to a holding cell, where she received a new wristband that identified her

gender as male. (*Id.* at 9.)  Plaintiff "was moved multiple times while waiting for her paperwork to

be processed, each time encountering new officers and inmates that misidentified her gender."  (*Id.*)

After Plaintiff was released from custody, she "filed a formal complaint regarding her

treatment in the Dallas County jail." (*Id.*)  On November 7, 2016, a local newspaper editor allegedly

contacted Captain Shelly Knight with the Dallas County Sheriff's Office about Plaintiff's experience

at the jail, and was told that "an investigation on the incident had been started and that intake video from November 4, 2016 was pulled." (*Id.*) Captain Knight also told the editor that she "could see where some of the policy was misconstrued and other parts were not followed." (*Id.* at 10.)

On April 19, 2017, Plaintiff was arrested a second time and taken to the Dallas County jail where she was classified male and held with the male inmates. (*Id.*) Plaintiff asked the officers to contact Captain Knight because she "could explain that she should be classified and placed with females," but they refused. (*Id.*) She alleges that she was "deemed suicidal as a result of the continuous harassment she was experiencing," and was taken to the psychiatric unit where she was the only female. (*Id.*) Plaintiff was not allowed to wear clothes and was only provided "a thin paper suit to wear." (*Id.*) She was also "forced [] to shower with the men, where one of the male inmates masturbated while staring at her in the shower." (*Id.*)

On June 15, 2018, Plaintiff was arrested a third time and again booked with the male inmates at the Dallas County jail. (*Id.* at 10-11.) She returned to the psychiatric unit, but was provided clothes. (*Id.* at 11.) She alleges that she had to "shower with the men, where once again a male inmate masturbated while staring at [her] in the shower." (*Id.*) A male officer also "recorded her in the shower while she was in the psychiatric unit." (*Id.*)

Plaintiff's complaint alleges that "the policy, custom, and practice of [the County] was to perform unconstitutional genital searches to determine gender identity and place inmates based off of genitalia rather than the gender with which they identify." (*Id.* at 15.) The "unconstitutional search to 'observe' her genitals and to 'determine' [her] gender and the harassment that accompanied her incarceration was objectively unreasonable as it violated Dallas County Sheriff's Office written policy and violated [her] rights under the Fourth and Fourteenth Amendment of the

United States Constitution."[3] (*Id.* at 11.) This "written policy was essentially overridden or deemed a nullity due to the actual conduct and performance of observing and searching a person's genitals when that person is believed or known to be transgender for the sole purpose of making a placement decision and ostensibly 'determining' the person's gender," and that "[t]his conduct was so common and widespread as to constitute a custom and practice" representing the policy of the County. (*Id.* at 12.) The complaint also alleges that there was "a similar incident involving a transgender female, C.W., at the Dallas County Jail in 2013," where the officers questioned her about being a "real female" and having a "working vagina," "forced her to undress, spread her buttocks, show the bottom of her feet, and then put on male jail attire," and placed her in the male area of the jail, where she was harassed and embarrassed in the same manner as Plaintiff. (*Id.* at 14.)

According to the complaint, the genitalia searches and gender classifications by the Dallas County jail staff also violated the Prison Rape Elimination Act (PREA) because it provides that lockup facilities "shall not search or physically examine a transgender or intersex inmate for the sole purpose of determining the inmate's genital status." (*Id.* (citing 28 C.F.R. § 115.15(e)).) Jail staff conduct also allegedly violated the Texas Administrative Code because it requires female inmates "be separated by sight and sound from male inmates." (*Id.* (citing Tex. Admin. Code § 271.1(a)(6)).) Plaintiff contends that "[t]he failure to ensure that written policies were adequately implemented and the implementation and toleration of the above practices, policies and customs, as well as the lack of adequate training by [the County], constitutes deliberate indifference to [her] constitutional rights," and "were the moving force, and the direct cause of [her] being unconstitutionally searched

---

[3]According to the complaint, the written policy referenced by Plaintiff is titled "Dallas County Sheriff's Department General Orders/Code of Conduct Vol. I Chapter 11.2 § VII(4) 1" and provides: "Transgender/ intersex/ gender nonconforming individuals will not be pat searched, frisk searched or strip searched for the sole purpose of determining their genital status." (doc. 18 at 13 fn. 2.)

and harassed." (*Id.* at 16.)

On July 22, 2019, the County moved to dismiss Plaintiff's municipal liability claim against it for failure to state a claim. (doc. 23.) She responded to the motion on August 12, 2019 (doc. 29-30), and the County filed its reply on August 26, 2019 (doc. 34).

## II.  RULE 12(b)(6)

The County moves to dismiss Plaintiff's municipal liability claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. (*See* doc. 23.)[4]

Rule 12(b)(6) allows motions to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  Pleadings must show specific, well-pleaded facts, not mere conclusory allegations to avoid dismissal. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992).  The court must accept those well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996).  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and 'that a recovery is very remote and unlikely.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citation omitted).  Nevertheless, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555; *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasizing that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). The alleged facts must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  In short, a complaint fails to state a claim upon which relief may be granted when it fails to

---

[4]Although the County also moves to dismiss claims against Brenda Devers, Lola Pugh, Selma Littles, Pamela Nixon, and Unknown Dallas County Employees I-II, IV-XIII, Plaintiff clarifies in her response to the motion to dismiss that she is "no longer pursuing claims against [these defendants]."  (docs. 23 at 23-24; 30 at 7 fn.2.)

6

plead "enough facts to state a claim to relief that is plausible on its face."  *Id*. at 570 (emphasis added).

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Iqbal*, 556 U.S. at 678 (citations omitted).  When plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."  *Twombly*, 550 U.S. at 570; *accord Iqbal*, 556 U.S. at 678 (noting that "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense").

### III.  42 U.S.C. § 1983

The County argues that Plaintiff's municipal liability claim under 42 U.S.C. § 1983 should be dismissed because she has failed to plead sufficient facts to support the existence of an official policy.  (doc. 23 at 14-17.)

Section 1983 "provides a federal cause of action for the deprivation, under color of law, of a citizen's 'rights, privileges, or immunities secured by the Constitution and laws' of the United States."  *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994).  It "afford[s] redress for violations of federal statutes, as well as of constitutional norms."  *Id*.  To state a claim, a plaintiff must allege facts that show (1) he has been deprived of a right secured by the Constitution and the laws of the United States and (2) the deprivation occurred under color of state law.  *See Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978); *Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 549 (5th Cir. 2005).

Municipalities, including counties and cities, may be held liable under § 1983.  *Hampton Co.*

7

*Nat'l Sur., LLC v. Tunica Cty.*, 543 F.3d 221, 224 (5th Cir. 2008). A municipality may be liable under § 1983 if the execution of one of its customs or policies deprives a plaintiff of his or her constitutional rights. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–91 (1978); *Jones v. City of Hurst*, No. 4:05-CV-798-A, 2006 WL 522127, at *3 (N.D. Tex. Mar. 2, 2006) (citing *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997)). It is well-settled that a municipality cannot be liable under a theory of *respondeat superior*, however.[5] *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing cases). "Under the decisions of the Supreme Court and [the Fifth Circuit], municipal liability under section 1983 requires proof of three elements: a policy maker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Id.* (citing *Monell*, 436 U.S. at 694); *see also Valle v. City of Houston*, 613 F.3d 536, 541-42 (5th Cir. 2010); *Cox v. City of Dallas*, 430 F.3d 734, 748 (5th Cir. 2005).[6]

"Official policy" is defined as:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority. Actions of officers or employees of a municipality do not render the municipality liable under § 1983 unless they execute official policy as above defined.

*Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (per curiam); *accord Pineda v. City*

---

[5]*Respondeat superior* [Law Latin "let the superior make answer"] is "[t]he doctrine holding an employer or principal liable for the employee's or agent's wrongful acts committed within the scope of the employment or agency." *Respondeat Superior*, Black's Law Dictionary (10th ed. 2014).

[6]Plaintiff identifies Sheriffs as the policymakers, and the County does not challenge whether she has sufficiently identified a policymaker. (*See* doc. 23 at 11, 20.)

*of Houston*, 291 F.3d 325, 328 (5th Cir. 2002).  Where a policy is facially constitutional, a plaintiff must demonstrate that it was promulgated with deliberate indifference to known or obvious consequences that constitutional violations would result.  *Piotrowski*, 237 F.3d at 579-80 & n.22; *accord Peterson v. City of Fort Worth*, 588 F.3d 838, 849-50 (5th Cir. 2009), *cert. denied*, 562 U.S. 827 (2010).  "Deliberate indifference of this sort is a stringent test, and 'a showing of simple or even heightened negligence will not suffice' to prove municipal culpability." *Piotrowski*, 237 F.3d at 579 (citation omitted) (stressing that "*Monell* plaintiffs [need] to establish both the causal link ('moving force') and the City's degree of culpability ('deliberate indifference' to federally protected rights)").

"The description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts."  *Spiller v. City of Texas City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997); *accord Piotrowski*, 237 F.3d 578-79.  "[A] complaint must contain either direct allegations on every material point necessary to sustain a recovery . . . or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial." *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995) (citation omitted).  In *Spiller*, the Fifth Circuit found the allegation that "[an officer] was acting in compliance with the municipality's customs, practices or procedures" insufficient to adequately plead a claim of municipal liability.  130 F.3d at 167 (citing *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992)).

A.    **Search/Classification**

The County argues that Plaintiff failed to plead sufficient facts to show an official policy of improperly searching and classifying transgender inmates, as evidenced by custom.  (*See* doc. 23 at 14-15.)

9

### 1.   Custom

A plaintiff basing a municipal liability claim on an alleged "'custom' that has not been formally approved by an appropriate decision-maker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Bd. of County Comm'rs*, 520 U.S. at 404.  A plaintiff may prove the existence of a custom by alleging "a pattern of abuses that transcends the error made in a single case." *Piotrowski*, 237 F.3d at 582; *see also Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 169 (5th Cir. 2010) (explaining a plaintiff may prove the existence of a custom by showing a pattern of unconstitutional conduct by municipal employees).

The Fifth Circuit has explained that "[w]here prior incidents are used to prove a pattern, they 'must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.'" *Peterson*, 588 F.3d at 850 (quoting *Webster*, 735 F.2d at 842).  "A pattern requires similarity and specificity." *Id.* at 851. It "also requires 'sufficiently numerous prior incidents,' as opposed to isolated instances." *Id.* (quoting *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989)); *see also Fuentes v. Nueces Cty.*, 689 F. App'x 775, 778 (5th Cir. 2017) (quoting *McConney*, 863 F.2d at 1184).  "Although there is no rigid rule regarding numerosity, [the Fifth Circuit has found] that 27 prior incidents of excessive force over a three-year period . . . and 11 incidents offering 'unequivocal evidence' of unconstitutional searches over a three-year period . . . were not sufficiently numerous to constitute a pattern." *Fuentes*, 689 F. App'x at 778 (internal citations omitted); *compare Peterson*, 588 F.3d at 850-52 (finding 27 incidents over three years insufficient), *and Pineda*, 291 F.3d at 329 (finding 11 incidents over three years insufficient), *with*

*Harper v. City of Dallas*, No. 3:14-CV-02647-P, 2015 WL 13729793, at *2-3 (N.D. Tex. Aug. 13, 2015) (determining that 14 shootings in the *same year* as the shooting at issue, along with other facts about DPD shootings, were sufficient to "support a reasonable inference that a persistent, widespread practice of excessive force" existed), *and Flanagan v. City of Dallas*, 48 F. Supp. 3d 941, 954 (N.D. Tex. 2014) (finding that "[w]hile it was a close call," 12 shootings in the *same year* as the shooting at issue, along with other facts regarding prior shootings, were sufficient to infer a "persistent, widespread practice by DPD officers" at the motion to dismiss stage).

Here, Plaintiff's complaint alleges that there "was a widespread practice among the Dallas County jail to conduct genital searches to determine gender identity and to place inmates based off of genitalia rather than the gender with which they identify when confronted with a transgender inmate in the Dallas County jail," and that it "was so widespread as to constitute the policy and custom of [the County]." (doc. 18 at 21.)  Although she points to her three prior detentions at the Dallas County jail and a 2013 incident involving C.W., she does not plead similar specific instances of genital searches for purposes of placement.  She alleges that she had to show her genitalia when she was booked in 2016, but does not allege that she was subjected to a search when she was booked in 2017 and 2018.  (*See* doc. 18 at 3-11.)  She alleges that the 2013 incident with C.W. involved a transgender female forced to undress and spread her buttocks prior to being given male attire; she does not specifically allege that C.W. was subjected to a genital search to verify gender.  (*See id.* at 14.)  Plaintiff has alleged only a single incident, which is insufficient to infer a custom.  *See World Wide Street Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 753-54 (5th Cir. 2009); *Pineda*, 291 F.3d at 329; *Piotrowski*, 237 F.3d at 581.

Even assuming for purposes of this motion only that Plaintiff's four examples over a five-

year period between 2013 and 2018 are sufficiently similar and specific enough, they are not sufficiently numerous under Fifth Circuit guidance.  *See Fuentes*, 689 F. App'x at 778.  At best, Plaintiff has only alleged two instances of genital searches, and four instances of gender classifications based on genitalia at the Dallas County jail.  She has therefore not plausibly alleged a custom sufficient to support a claim for municipal liability. *See World Wide Street Preachers Fellowship*, 591 F.3d at 753-54; *Pineda*, 291 F.3d at 329; *Piotrowski*, 237 F.3d at 581; *Fuentes*, 689 F. App'x at 778.

Plaintiff argues that she has sufficiently pleaded a policy because she has alleged that the County's employees expressly acknowledged the policy and attributed it to a policy maker, Sheriff Valdez. (doc. 30 at 13.)  Her complaint alleges that Officers and Nurse twice acknowledged a policy to search genitalia for purposes of determining placement that they impliedly attributed to Sheriff Valdez, and that Captain Knight stated to the media that she "could see where some of the policy was misconstrued and other parts were not followed."  (*See* doc. 18 at 5-6, 10.)  "[I]t is true that '[a]n official policy or custom can be gleaned from . . . public acknowledgments of failure on the part of [a] City[,] couple[d] with assertions by various Individual Defendants that they were simply doing as they were taught and trained.'"  *Bryan v. City of Dallas*, 188 F. Supp. 3d 611, 618 (N.D. Tex. 2016) (quoting *Cook v. City of Dallas*, 3:12-CV-3788-P, 2013 WL 11084496, at *8 (N.D.Tex. Oct. 28, 2013)).  In *Bryan*, the plaintiffs sued the city under § 1983 because it maintained "a policy, practice, and custom to delay and/or fail to provide assistance to victims who suffered domestic violence, are racial minorities, and/or were attacked in socioeconomically deprived areas" and they had been harmed as a result.  188 F. Supp.3d at 616.  They pointed to a letter from a 9-1-1 operator in another case who "expound[ed] upon her training, in an effort to demonstrate how she acted

appropriately and yet still was involved in a 911 urgent response lasting roughly 50 minutes." *Id.* at 618 (quoting *Cook*, 2013 WL 11084496, at *8 (alterations omitted)). They also referenced public statements by the city's official policy makers acknowledging that prior incidents where 9-1-1 dispatchers failed to promptly respond to calls involving racial minorities or socioeconomically deprived areas were the result of institutional failures. *Bryan*, 188 F. Supp.3d at 618. The court ultimately found that the plaintiffs' allegations regarding a non-policymaker's statements that her actions were based upon her training (i.e., the alleged policy) and the admissions of institutional failures by the official policymakers were insufficient to plead an official policy to "inch[] past the Rule 12(b)(6) threshold to survive dismissal" because the policymakers' admitted institutional failures were far less specific than those made in *Cook*. *Id.* at 618-199 (quoting *Cook*, 2013 WL 11084496, at *8); *compare Groden v. City of Dallas*, 826 F.3d 280, 286 (5th Cir. 2016) (holding that the plaintiff's allegations that the city's official spokesman publicly announced the new policy of "cracking down" on street vendors and gave media interviews sufficiently plead an official policy made by the policymaker)).

Here, Plaintiff references three statements by County employees referring to a policy impliedly attributed to Sheriff Valdez, two of which were made by the same persons, and a third that did not specifically reference the alleged policy. Even viewing those allegations in the light most favorable to Plaintiff, however, she pleads no facts that "adequately connected a policy to the policymaker." *Longoria Next Friend of M.L. v. San Benito Indep. Consol. Sch. Dist.*, 942 F.3d 258, 271 (5th Cir. 2019) (*citing Groden*, 826 F.3d at 286). In contrast to *Bryan* and *Cook*, she pleads no institutional admissions or statements by a policymaker, only by non-policymaking employees. The wrongful conduct of an employee without policymaking authority cannot be considered a municipal

policy. *Collins v. City of Harker Heights*, 503 U.S. 115, 121 (1992).  Because Plaintiff only relies on statements from non-policymaking employees to show a policy or custom of searching genitalia for purposes of transgender detainee placement, she has not sufficiently alleged an official policy, as evidenced by a persistent widespread practice so common and well settled as to constitute a custom that fairly represents municipal policy

### 2.    *Constructive Knowledge*

The County also argues that Plaintiff "has failed to plead any facts from which the knowledge of a custom or policy by a specific policymaker can reasonably be inferred."  (*See* doc. 23 at 16-17.)

A municipality "cannot be liable for an unwritten custom unless '[a]ctual or constructive knowledge of such custom' is attributable to a city policymaker." *Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (citing *Hicks–Fields v. Harris Cty.*, 860 F.3d 803, 808 (5th Cir. 2017)).  To establish municipal liability under § 1983 based on an alleged "persistent widespread practice or custom that is so common it could be said to represent municipal policy, actual or constructive knowledge of such practice or custom must be shown." *Malone v. City of Fort Worth*, 297 F. Supp. 3d 645, 654 (N.D. Tex. 2018) (citing *Hicks–Fields*, 860 F.3d at 808).  In the Fifth Circuit, "[a]ctual knowledge may be shown by such means as discussion at council meetings or receipt of written information."  *Hicks–Fields*, 860 F.3d at 808 (quoting *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984)).  "Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or a high degree of publicity." *Id.*

14

The complaint alleges that "either Valdez or [ ] Brown served as policy maker for Dallas County in relation to the policies, written and unwritten, regarding detainees held in the custody of the Dallas County Sheriff's Department and confined in the Dallas County jail." (doc. 18 at 26.) Even if Plaintiff had alleged facts of a widespread practice of genitalia searches for gender classification by jail staff at the Dallas County jail, she has not alleged facts to show "'actual or constructive knowledge of such custom' by the municipality or the official who had policymaking authority." *Hicks–Fields*, 860 F.3d at 808 (citing *Webster*, 735 F.2d at 841); *see, e.g., Singleton v. Champagne*, No. CV 17-17423, 2019 WL 917728, at *4 (E.D. La. Feb. 25, 2019) (dismissing municipal liability claim as bare allegations that the sheriff "maintained an atmosphere of lawlessness" failed to support claim that she had "actual or constructive knowledge of any alleged practices or customs that allegedly violated Plaintiffs' constitutional rights"). There are no allegations that issues involving transgender detainees at the Dallas County jail were considered at an official meeting attended by Sheriffs, or that information about the purported custom had been directed to Sheriffs. *See Hicks–Fields*, 860 F.3d at 808; *see also Pinedo v. City of Dallas*, No. 3:14-CV-0958-D, 2015 WL 221085, at *7 (N.D. Tex. Jan. 15, 2015) (finding allegations that police custom of using excessive force "were known by the City of Dallas, the City Attorneys, the City Manager, the City Council and the Chief of Police" were "insufficient to permit the court to draw the reasonable inference that the City Council-the City's final policymaker-can be charged with actual or constructive knowledge of the alleged custom of tolerating the unconstitutional use of excessive or deadly force").[7] Plaintiff has failed to allege facts that any policymaker had

---

[7]Plaintiff's response to the motion to dismiss appears to argue that Sheriffs had been "aware of the violative behavior of its employees" because she had "filed a formal complaint regarding her treatment in the Dallas County jail, a Captain with the Dallas County Sheriff's Office was specifically notified of [her] treatment, and an investigation of the incident was conducted involving reviewing video of employees mistreating [her]." (*See* doc. 30

15

constructive knowledge of a custom of searching genitalia for purposes of determining placement of transgender detainees at the Dallas County jail.

**B.**   <u>**Failure to Train, Supervise, or Discipline**</u>[8]

The County argues that Plaintiff's claims for failure to train, supervise, and discipline should be dismissed because she fails "to plead sufficient facts to permit a rational inference to support an official adopted or promulgated policy regarding failure to train," and she fails "to plead sufficient facts to permit a rational inference of policymaker deliberate indifference on her failure to train claim." (doc. 23 at 17-21.)

*1.*   *Policy*

"[W]hen a municipal entity enacts a facially valid policy but fails to train its employees to implement it in a constitutional manner, that failure constitutes 'official policy' that can support municipal liability if it 'amounts to deliberate indifference.'"   *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see Peterson*, 588 F.3d at 849 (citing *Brown v. Bryan Co.*, 219 F.3d 450, 458 (5th Cir. 2000), *cert. denied*, 131 S. Ct. 66 (2010)) ("The failure to train can amount to a policy if there is deliberate indifference to an obvious need for training where citizens are likely to lose their constitutional

---

at 21.)  Even if considered part of the complaint, these allegations are insufficient to show Sheriffs' actual or constructive knowledge.  *See Hatcher v. City of Grand Prairie*, No. 3:14-cv-432-M, 2014 WL 3893907, at *6 (N.D. Tex. Aug. 6, 2014) (allegations of actual or constructive knowledge based on multiple complaints and lawsuits that injuries were resulting from officers' misuse of force were no more than conclusory allegations); *compare Fennell v. Marion Indep. Sch. Dist.*, 963 F. Supp. 2d 623, 643-43 (W.D. Tex. 2013) (finding plaintiffs' presentation of a grievance to the school's board of trustees where "they described ... the same incidents that they allege in [their complaint]" was sufficient to show that school board had knowledge of the impermissible treatment of plaintiffs).

[8]Although Plaintiff separately alleges claims for failure to train and failure to supervise or discipline against the County, (doc. 18 at 21-26), the elements required to prove a claim under either theory are the same.  *E.G. v. Bond*, No. 1:16-CV-068-C, 2017 WL 129019, at *3 (N.D. Tex. Jan. 13, 2017) (citing cases).  These claims are therefore considered together.

rights on account of novices in law enforcement."). Nevertheless, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61, (2011).[9] To establish municipal liability based on a failure to train in the Fifth Circuit, the plaintiff must show (1) inadequate training procedures; (2) that inadequate training caused the constitutional violation; and (3) the deliberate indifference of municipal policymakers. *Quinn v. Guerrero*, 863 F.3d 353, 365 (5th Cir. 2017) (quoting *Pineda*, 291 F.3d at 332). "In addition, for liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective." *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005) (citing *Benavides v. County of Wilson*, 955 F.2d 968, 973 (5th Cir. 1992)).

The complaint generally alleges that the County "failed to provide constitutionally adequate training and supervision regarding the use of searches to determine gender and placement of transgender inmates." (doc. 18 at 21.) Plaintiff has not identified a specific training policy and makes only conclusory allegations that the County's training policies or procedures were inadequate. *See Roberts*, 397 F.3d at 293; *see e.g., Edwards v. Oliver*, No. 3:17-CV-01208-M-BT, 2019 WL 4603794, at *9 (N.D. Tex. Aug. 12, 2019), *adopted by* 2019 WL 4597573 (N.D. Tex. Sept. 23, 2019) (finding allegations that "Defendant the City of Balch Springs under the direction of the Balch Springs City Council and Chief Haber maintained a policy of deficient training of its police force in the use of force, including the proper use of deadly force and dealing with individuals during a

---

[9]Courts recognize that even officers who are adequately trained, supervised, and disciplined "'occasionally make mistakes,'" and "'the fact that they do says little about the training,'" supervision, or disciplinary policies and procedures of a city. *E.G. by Gonzalez v. Bond*, No. 1:16-CV-0068-BL 2017 WL 3493124, at *5 (quoting *City of Canton*, 489 U.S. at 391), *adopted by* 2017 WL 3491853 (N.D. Tex. Aug. 14, 2017). Rather, the "law requires that the officer's shortcomings resulted from the faulty training program (or faulty supervision or discipline procedures) to impose municipal liability for an alleged failure to act." *Id*.

raid of an event" was insufficient to plead an inadequate training policy); *Rodriguez v. Parker*, No. 1:15-CV-181-P-BL, 2016 WL 4179798, at \*4 (N.D. Tex. Apr. 8, 2016), *adopted by* 2016 WL 4184437 (N.D. Tex. Aug. 5, 2016) (dismissing failure to train claim as "Rodriguez makes only bare, conclusory allegations that Parker failed to train Wynn in the use of force and she make no attempt to specify how Wynn might have been trained differently").   "This absence of 'minimal factual allegations' that ultimately could support a showing that [the County's] training procedures were inadequate – and, further, inadequate as a result of deliberate indifference – requires rejection of this theory of municipal liability." *Montgomery v. Hollins*, No. 3:18-CV-1954-M-BN, 2019 WL 2424053, at \*7 (N.D. Tex. May 8, 2019), *adopted by* 2019 WL 2422493 (N.D. Tex. June 10, 2019). Because Plaintiff has failed to allege even the existence of an allegedly inadequate training policy or procedure, she has failed to sufficiently plead the first element that "a training policy or procedure was inadequate." *Zarnow*, 614 F.3d at 170 (quoting *Roberts*, 397 F.3d at 293).

### 2.    *Deliberate Indifference*

Even if Plaintiff had pointed to an inadequate training policy, she fails to allege facts showing deliberate indifference.   As noted, "[t]he failure to train [or supervise] must reflect a 'deliberate' or 'conscious' choice by a municipality." *World Wide Street Preachers Fellowship*, 591 F.3d at 756 (quoting *City of Canton*, 489 U.S. at 389) (internal quotation marks omitted).  To show that the municipality acted with deliberate indifference, a plaintiff must demonstrate "at least a pattern of similar violations arising from training that is so clearly inadequate as to be obviously likely to result in a constitutional violation." *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003); *see Flanagan v. City of Dallas*, 48 F. Supp. 3d 941, 956 (N.D. Tex. 2014) (quoting *Kitchen v. Dallas Cty.*, 759 F.3d 468, 484 (5th Cir. 2014)) (stating that the most common approach

18

to asserting a failure to train claim is to demonstrate a pattern of similar violations that "were 'fairly similar to what ultimately transpired' when the plaintiff's own constitutional rights were violated."). As discussed, the alleged pattern of prior incidents require "similarity and specificity" and must be "sufficiently numerous." *See Fuentes,* 689 F. App'x at 778; *Peterson*, 588 F.3d at 851.

Here, Plaintiff generally alleges that the defendants were "deliberately indifferent to her safety and dignity" because they knew or should have known that the County's employees would have to deal with processing transgender detainees on a regular basis, and that the situation "had the real potential for injury and/or serious harm to a citizen," but they "provided no training or inadequate training to employees on how to deal with this situation." (doc. 18 at 25.) She claims that the County's "practices, policies, customs and/or the constitutionally inadequate training were the moving forces behind the constitutional violations that resulted in [her] mental/emotional injuries." (*Id.*)[10] In support, Plaintiff again points to the three times she was booked into the Dallas County jail and the 2013 incident involving C.W. (*See id.* at 21.)

As noted, four incidents over five years are not sufficient to show a pattern of constitutional violations. *See Fuentes*, 689 F. App'x at 778; *see, e.g., Pinedo v. City of Dallas*, No. 3:14-CV-0958-D, 2015 WL 5021393, at *9 (N.D. Tex. Aug. 25, 2015) (noting "the occurrence of only two prior incidents involving the use of excessive force against mentally ill individuals is insufficient to permit the court reasonably to infer that there was a pattern of violations such that the City Council can be said to have been deliberately indifferent to the need for additional training"). Because these incidents are distinguishable from each other and are not sufficiently numerous to establish a pattern, they are insufficient to show a custom or policy supporting municipal liability

---

[10]She also asserts claims against Sheriffs in their individual capacities under § 1983 for supervisory liability and failure to train. (*See* doc. 18 at 20-21.)

under the theories of failure to train, supervise, or discipline. *See Lopez-Rodriguez v. City of Levelland, Tex.*, 100 F. App'x 272, 274 (5th Cir. 2004); *see also Fuentes*, 689 F. App'x at 778.[11]

Moreover, Plaintiff makes only conclusory allegations regarding the County's alleged failures, and her allegations do not suffice to show that the County's policymakers were repeatedly put on notice that additional training or supervision for jail staff was needed. She alleges that she filed a formal complaint after the 2016 incident, and that Captain Knight received notice of that dispute, (*see* doc. 18 at 9-10), but these allegations are insufficient to show that the purported policymakers had notice of the 2016 incident or any other incident. Additionally, she alleges no facts in support of her assertion that the County's alleged failures reflect deliberate indifference on part of its policymakers. (*See id.* at 22.)

Even accepting her well-pleaded facts as true and viewing them in the light most favorable to her, as the Court must, Plaintiff has failed to nudge her failure to train, supervise, or discipline claim across the line from conceivable to plausible. *See Twombly*, 550 U.S. at 555. She has failed

---

[11]There is an "extremely narrow" single incident exception in the context of failure-to-train claims. *Hobart v. Estrada*, 582 F. App'x 348, 358 (5th Cir. 2014). Under that exception, "§ 1983 liability can attach for a single decision not to train an individual officer even where there has been no pattern of previous constitutional violations" in "extreme circumstances." *Brown*, 219 F.3d at 459; *Khansari v. City of Houston*, No. H-13-2722, 2015 WL 6550832, at *16 (S.D. Tex. Oct. 28, 2015) ("The facts of *Brown* demonstrate that single violation liability applies only in extreme circumstances." (citing *Brown*, 219 F.3d at 452-48)). To show liability, "a plaintiff must prove that the highly predictable consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the constitutional violation." *Sanders–Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010). To the extent Plaintiff relies on this exception based on her allegations the defendants "provided no training or inadequate training to employees on how to deal with" transgender detainees, she does not allege any facts in support of her conclusory allegations. (*See* doc. 18 at 25.) Additionally, the exception would not apply because she does not claim that the County's employees "w[ere] provided no training whatsoever." *Pena v. City of Rio Grande City*, 879 F.3d 613, 624 (5th Cir. 2018) ("Our caselaw suggests, however, that the exception is generally reserved for those cases in which the government actor was provided no training whatsoever"); *see McClendon v. City of Columbia*, 258 F.3d 432, 442-43 (5th Cir. 2001), *vacated for reh'g en banc*, 285 F.3d 1078 (5th Cir. 2002), *decision on rehearing en banc*, 305 F.3d 314 (5th Cir. 2002) (noting "there is a difference between a complete failure to train ... and a failure to train in one limited area.").

to plead sufficient facts to support a finding of municipal liability under § 1983.[12]

## IV.  RECOMMENDATION

The County's motion should be **GRANTED**,[13] and Plaintiff's claims against it should be

**DISMISSED with prejudice**.[14]

**SO RECOMMENDED** on this 27th day of February 2020.

*Irma Carrillo Ramirez*

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[12]Plaintiff sues the Sheriffs in their official capacities. (*See* doc. 18 at 1-2.)  An official capacity claim is merely another way of pleading an action against the entity of which the individual defendant is an agent. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  Plaintiff's § 1983 claims against Sheriffs in their official capacities are therefore essentially claims against their government employer, the County. *See Graham*, 473 U.S. at 165. Because Plaintiff has failed to state a claim for municipal liability against the County, the official capacity claims against Sheriffs under § 1983 likewise fail. *See Beavers v. Brown*, No. 3:13-CV-1395-B, 2013 WL 6231542, at *3 (N.D. Tex. Dec. 2, 2013) (finding that claims against county employees in their official capacities should be dismissed where the plaintiff failed to state a claim for municipal liability).

[13]The County seeks attorney's fees in its motion to dismiss.  (*See* doc. 23 at 24.)  In a suit to enforce § 1983, the court may, in its discretion, grant the prevailing party reasonable attorneys' fees and related expenses. *See* 42 U.S.C. § 1988(b).  While a prevailing plaintiff in a § 1983 action is usually entitled to an award of fees under § 1988, "prevailing defendants cannot recover § 1988 fees without demonstrating that the plaintiff's underlying claim was frivolous, unreasonable or groundless." *Merced v. Kasson*, 577 F.3d 578, 595 (5th Cir. 2009) (citation omitted).  To the extent that the County seeks attorney's fees, it may file a post-judgment request under Federal Rule of Civil Procedure 54(d)(2) that also complies with the applicable Local Civil Rules for the Northern District of Texas.

[14]Plaintiff's response to the motion to dismiss "requests the opportunity to amend and allege additional facts to clarify [her] claims" if her allegations are found deficient.  (doc. 30 at 24-25.)  A party is not entitled to remedy a pleading deficiency simply by seeking leave to amend in response to a motion to dismiss, however. *Spiller*, 130 F.3d at 167.  When a party opposes a motion to dismiss on its merits while also asking for leave to amend should dismissal be deemed proper, the party "may not avoid the implications" of her choices. *Id*.  In addition, Plaintiff has not sought leave to amend in accordance with LR 15.1, and her request may be denied on this basis. *Shabazz v. Franklin*, 380 F. Supp. 2d 793, 798 (N.D. Tex. 2005) (accepting recommendation).  The request to amend is denied without prejudice to filing a compliant motion.

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE