## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **VALERIE JACKSON** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:18-cv-2935** |
| | § | |
| **LUPE VALDEZ, MARIAN BROWN,** | § | |
| **SAMUEL JOSEPH, LIZYAMMA** | § | |
| **SAMUEL, UNKNOWN DALLAS** | § | |
| **COUNTY EMPLOYEE III, and** | § | |
| **DALLAS COUNTY, TEXAS,** | § | |
| | § | |
| *Defendants*. | § | |

## PLAINTIFF'S RULE 7(a) REPLY TO THE ASSERTION OF QUALIFIED IMMUNITY BY THE INDIVIDUAL DEFENDANTS

Respectfully submitted,

/s/ Scott H. Palmer
SCOTT H. PALMER
State Bar No. 00797196
JAMES P. ROBERTS
State Bar No. 24105721

SCOTT H. PALMER, P.C.
15455 Dallas Parkway,
Suite 540, LB 32
Dallas, Texas 75001
Tel: (214) 987-4100
Fax: (214) 922-9900
scott@scottpalmerlaw.com
james@scottpalmerlaw.com

ATTORNEYS FOR PLAINTIFF

1

**TABLE OF CONTENTS**

A.   Introduction ...................................................................................................... 4

B.   Factual Background ........................................................................................... 4

C.   Argument and Authorities ................................................................................ 18

    SAMUEL JOSEPH ("S. JOSEPH") ................................................................. 18

    LIZYAMMA SAMUEL ("L. SAMUEL") .......................................................... 21

    UNKNOWN DALLAS COUNTY EMPLOYEE III ......................................... 25

    SHERIFF LUPE VALDEZ .............................................................................. 28

    MARIAN BROWN ........................................................................................... 33

D.   Prayer ............................................................................................................... 36

    CERTIFICATE OF SERVICE ........................................................................ 37

# TABLE OF AUTHORITIES

**CASES**

*Cf. Evans v. Stephens*,
  407 F.3d 1272 (11th Cir.2005) ................................................................. 25

*Felton v. Polles*,
  315 F.3d 470, 473 (5th Cir. 2002) ........................................................... 19

*Hare v. City of Corinth, Miss.*,
  135 F.3d 320, 325 (5th Cir. 1998) ........................................................... 19

*Harlow v. Fitzgerald*,
  457 U.S. 800, 815-819, 102 S. Ct. 2727, 73 L. Ed.2d 396 (1982) ........................................... 19

*Oliver v. Scott*,
  276 F.3d 736, 745 (5th Cir. 2002) ................................................... passim

*United States v. Afanador*,
  567 F.2d 1325, 1331 (5th Cir. 1978) ............................................... passim

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. IV ...................................................... 21, 24, 27, 32

**CODES**

28 CFR § 115.15(e)...................................................................... passim

General Orders/Code of Conduct Vol. I Chapter 11.2.................................................. 35

Texas Administrative Code § 271.1(a)(6) ....................................... 14, 30, 34

Texas Administrative Code § 271.4.................................................. 14, 31, 34

The General Rules/Code of Conduct § VII(4) ................................... 14, 31

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, VALERIE JACKSON, Plaintiff, and files her Rule 7(a)(7) Reply to the Assertion of Qualified Immunity by the Individual Defendants, and would respectfully show unto the Court as follows:

### A.     Introduction

1.      Lupe Valdez, Marian Brown, Samuel Joseph, Lizyamma Samuel, and Unknown Dallas County Employee III (the "Individual Defendants") have been sued under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments, in particular, the unreasonable strip search of Valerie Jackson for the sole purpose of determining the inmate's genital status, as well as the failure to train and supervise by Sheriff Lupe Valdez and Sheriff Marian Brown that resulted in the illegal strip search and her improper placement with the male detainee population.

2.      The Individual Defendants have asserted the defense of Qualified Immunity and the Court ordered this reply on February 20, 2020.

3.      Plaintiff incorporates by reference all allegations, factual or otherwise, as asserted in her First Amended Complaint.

### B.     Factual Background

4.      Defendant Valdez was the Sheriff of Dallas County from January 1, 2005 until January 1, 2018.

5.      Plaintiff Valerie Jackson was assigned the sex of male at birth.

6.      Ms. Jackson is a transgender woman, and lives as a woman.

7.      Ms. Jackson had her gender legally changed to female prior to the events giving rise to her causes of action in this case.

8.      On or about November 4, 2016, Ms. Jackson was a pre-trial detainee at the Dallas County jail. She was booked into custody for Possession of a Weapon in a Prohibited Place – essentially, she forgot to remove her firearm from her bag before going to the airport.

9.      During the intake process at the jail, Ms. Jackson was processed by a female Dallas County employee, S. Joseph or L. Samuel. Ms. Jackson was asked all the standard intake questions.

10.     S. Joseph or L. Samuel verified Ms. Jackson's name and gender on her driver's license.

11.     Ms. Jackson was given a wrist band with her name and the correctly assigned gender of female.

12.     S. Joseph or L. Samuel then took Ms. Jackson behind an enclosed corner and instructed Ms. Jackson to lift her shirt and bra to expose her bare breasts, which she did.

13.     Ms. Jackson then waited to be seen by a nurse.

14.     A male nurse, Unknown Dallas County Employee I, then began to ask Ms. Jackson medical questions.

15.     Unknown Dallas County Employee I asked Ms. Jackson the date of her last menstrual cycle.

16.     Ms. Jackson replied that she does not have menstrual cycles because she does not have a uterus.

17.     Unknown Dallas County Employee I asked her if she had a hysterectomy, and Ms. Jackson responded that she had not.

18.     Unknown Dallas County Employee I kept asking why she doesn't have menstrual cycles, and Ms. Jackson finally explained that she is transgender.

19.     Unknown Dallas County Employee I had a look of shock on his face and asked why her paperwork says female on it.

20.     Ms. Jackson explained that she is a female.

21.     Unknown Dallas County Employee I left her paperwork the way it was filled out and concluded the medical assessment.

22.     Ms. Jackson was then directed to sit on the benches with the rest of the female inmates.

23.     After around ten minutes, a different male officer, Unknown Dallas County Employee II, pulled Ms. Jackson aside and asked her to identify her gender.

24.     Ms. Jackson responded that she was a female.

25.     Unknown Dallas County Employee II asked, "did you have a sex change or something?"

26.     Ms. Jackson responded that she had.

27.     In front of the rest of the inmates around them, Unknown Dallas County Employee II asked, "have you had everything done even down there?"

28.     Ms. Jackson hesitantly and falsely told him that she had, because she wanted this unnecessary and humiliating harassment to end.

29.     Unknown Dallas County Employee II then went to get S. Joseph or L. Samuel from intake and a female nurse, Unknown Dallas County Employee III.

30.     Unknown Dallas County Employee III and S. Joseph or L. Samuel took Ms. Jackson behind the same enclosed corner as before and instructed her to pull down her pants and underwear.

31.     Ms. Jackson asked why she needed to do this.

32.     S. Joseph or L. Samuel replied, "We need to know if you've had a sex change or not. We need to see if you have a penis or a vagina. We have to protect you. We can't put you with men if you have a vagina."

33.     Ms. Jackson responded that she was not going to pull her pants and underwear down and that she should not have to prove anything to them if none of the other women had to prove anything.

34.     S. Joseph or L. Samuel then replied, "You are coming up in the system as male. It doesn't matter what you do, it can never be changed."

35.     S. Joseph or L. Samuel then said, "**now our policy is we have to verify that you've had a sex change**. If you have a penis you're going with the men. If you have a vagina, you're going with the women."

36.     Ms. Jackson continued to insist that she did not want to pull her pants down.

37.     S. Joseph or L. Samuel then told Ms. Jackson that they would transfer her to Parkland Hospital if she refused, that Ms. Jackson would have to show her genitals at Parkland Hospital, and that it would add hours to her incarceration.

38.     Ms. Jackson pleaded to sit with the female inmates, with whom she identified and whose gender she legally shares.

39.     S. Joseph or L. Samuel responded, **"that's our policy. You can talk to Lupe Valdez about it when you get out."**

40.     Ms. Jackson asked if she could do this after going to court if she was unable to make bond.

41.     S. Joseph or L. Samuel explained that this was the next step of the process and **the process could not move forward without Ms. Jackson revealing her genitals, so that they could verify her genitalia**.

42.     Feeling that she was out of options and had no other choice, Ms. Jackson pulled her pants and underwear down to her knees so that Unknown Dallas County Employee III and S. Joseph and L. Samuel could verify her genitalia and gender.

43.     This unconstitutional search conducted by Unknown Dallas County Employees III and S. Joseph or L. Samuel was conducted for the sole purpose of observing Ms. Jackson's genitals, ostensibly for the purpose of determining whether she is transgender.

44.     This unconstitutional search caused severe distress to Ms. Jackson.

45.     Following this unconstitutionally invasive search to designate Ms. Jackson's gender based exclusively on her genitals, she was told that she could watch TV with the men or could go into a solitary cell.

46.     S. Joseph or L. Samuel told Ms. Jackson, "It's not uncommon for men that look like women to be sitting in the men's section and vice versa. You'll probably see some like you over there. You aren't the first and you won't be the last".

47.     Ms. Jackson chose to be alone, thinking she could save herself from further harassment.

48.     While waiting for a cell, Ms. Jackson noticed that there was a group of men walking freely outside the solitary cells. She decided that she would be harassed either way and asked to remain in the TV area.

49.     As soon as she made this request, an older male officer, Unknown Dallas County Employee IV, said, "No, you're going with the men because that's what you are. You're a man."

50.     Ms. Jackson was then placed in her own cell, where the male inmates began questioning her through the cell door.

51.     They were asking her if she was a "tranny" or a "real girl", telling her all the sexual things they wanted to do to her, grabbing themselves, calling her a "he/she," and calling her many other derogatory words.

52.     A female officer, Unknown Dallas County Employee V, asked Ms. Jackson if she was alright. Upon responding that she was not alright, the female Unknown Dallas County employee laughed and told Ms. Jackson, "at least you have someone to talk to."

53.     After enduring the harassment for an unknown amount of time, Ms. Jackson was taken by a male officer for fingerprinting and a mugshot.

54.     A male officer attempted to escort Ms. Jackson back to the women's solitary cells; however, he was told by another officer, Unknown Dallas County Employee VI, to bring her to the men's holding area.

55.     Ms. Jackson was again placed with the male inmates after another embarrassing situation.

56.     Ms. Jackson was eventually taken in a line with male inmates to court. As they walked past another group of men, she was harassed again.

57.     A different female officer, Unknown Dallas County Employee VII, said loudly from across the room, "Why is that woman with all those men?"

58.     A male officer, Unknown Dallas County Employee VIII, then responded from across the room, "because it's a man."

59.     Unknown Dallas County Employee VIII said this twice because Unknown Dallas County Employee VII didn't hear the first time.

60.     This was said in front of all of the other inmates in the area.

61.     During court, Ms. Jackson was referred to as "Mr. Jackson," by the male bailiff and was required to sit with the males.

62.     Ms. Jackson was humiliated every time she encountered a new officer. Each time, they would see her and reference her as a woman, only to be told by whichever officer was escorting her in front of everyone that she was a man.

63.     All Ms. Jackson was able to do was cry as she suffered the worst humiliation of her entire life.

64.     When they arrived back at the jail, the men were placed into a holding cell and Ms. Jackson was placed into a separate cell next to them.

65.     Ms. Jackson was required to fill out new paperwork.

66.     Ms. Jackson was then taken to the male locker room where she was directed toward an empty shower stall by a male officer, Unknown Dallas County Employee IX.

67.     Ms. Jackson was told to strip down and take a shower by Unknown Dallas County Employee IX and that it was something everyone had to do.

68.     Ms. Jackson pleaded with Unknown Dallas County Employee IX to let her skip the shower as her bond was being sent electronically by her lawyer and she should be out of custody soon.

69.     The two male officers that were present ignored her pleas.

70.     The female officer volunteered to verify what Ms. Jackson was saying and did in fact confirm that the bond was received.

71.     The female officer then escorted Ms. Jackson out of the locker room and told her that she, "dodged a bullet."

72.     Ms. Jackson was placed back into another holding cell by herself as she waited for her paperwork to process.

73.     While she was waiting, another female officer, Unknown Dallas County Employee X, came into the cell and changed Ms. Jackson's wrist band so that it now showed her gender as male.

74.     Ms. Jackson was moved multiple times while waiting for her paperwork to be processed, each time encountering new officers and inmates that misidentified her gender based off the paperwork and the gender of the inmates she was grouped with at the time.

75.     After being released from custody, Ms. Jackson filed a formal complaint regarding her treatment in the Dallas County jail.

76.     On November 7, 2016, Captain Shelley Knight with the Dallas County Sheriff's Office was notified of Ms. Jackson's treatment through Tammye Nash, the Managing Editor at the Dallas Voice.

77.     Captain Knight informed Ms. Nash that an investigation on the incident had been started and that intake video from November 4, 2016 was pulled.

78.     Captain Knight also informed Ms. Nash that she (Captain Knight) could see where some of the policy was misconstrued and other parts were not followed.

79.     On April 19, 2017, Ms. Jackson was arrested for a second time and taken to the Dallas County jail.

80.     When booked into the jail, Ms. Jackson was again placed with the male inmates.

81.     Detention officers Devers, Pugh, Nixon, and Littles were the detention officers who booked Ms. Jackson into the jail and placed her with the male inmates.

82.      Ms. Jackson asked Devers, Pugh, Nixon, and Littles to contact Captain Knight, who could explain that she should be classified and placed with females -- but they refused her request.

83.      Ms. Jackson was taken to the psychiatric unit of the jail due to being deemed suicidal as a result of the continuous harassment she was experiencing.

84.      Ms. Jackson was the only woman in the psychiatric unit with all the male inmates.

85.      Due to being marked suicidal, Ms. Jackson was not allowed clothing and was given a thin paper suit to wear.

86.      Unknown Dallas County Employee XI forced Ms. Jackson to shower with the men, where one of the male inmates masturbated while staring at her in the shower.

87.      Defendant Brown was sworn in as the Dallas County Sheriff on January 1, 2018 and has served as Dallas County Sheriff since that time.

88.      On June 15, 2018, Ms. Jackson was arrested for a third time and booked into the Dallas County jail.

89.      Ms. Jackson was once again placed with the male inmates by Unknown Dallas County Employee XII.

90.      Ms. Jackson was once again taken to the psychiatric unit; however, this time she was given clothes.

91.      Ms. Jackson once again had to shower with the men, where once again a male inmate masturbated while staring at Ms. Jackson in the shower.

92.      Additionally, a male officer, Unknown Dallas County Employee XIII, recorded her in the shower while she was in the psychiatric unit.

93.     Each time Ms. Jackson was incarcerated in Defendant Dallas County's facility, she was subjected to continual sexually harassing and offensive comments relating to her gender identity, her transgender status, and her gender expression, by jail staff and inmates.

94.     Defendants were acting within the course and scope of their positions as either Dallas County Sheriff or as Dallas County employees at the time of the wrongful acts. All other Dallas County employees involved in the violation of Plaintiff's constitutional rights were acting within the course and scope of their employment at the time of the wrongful acts.

95.     Ms. Jackson suffered severe mental anguish as a result of the unconstitutional searches and harassment she endured.

96.     The unconstitutional search to "observe" her genitals and allegedly to "determine" Ms. Jackson's gender and the harassment that accompanied her incarceration was objectively unreasonable as it violated Dallas County Sheriff's Office written policy and violated Plaintiff's rights under the Fourth and Fourteenth Amendment of the United States Constitution, and the Prison Rape Elimination Act.

97.     However, the written policy was essentially overridden or deemed a nullity due to the actual conduct and performance of observing and searching a person's genitals when that person is believed or known to be transgender for the sole purpose of making a placement decision and ostensibly "determining" the person's gender. This conduct was so common and widespread as to constitute a custom and practice that fairly represents the policy of Dallas County, Texas.

98.     Defendants implemented and maintained a policy, custom, and practice of classifying transgender inmates based exclusively on genital characteristics rather than their gender identity without any individualized determination of what would be safest, or in the alternative, Defendants failed to properly train and supervise jail staff to follow policy and practice

prohibiting the classification of transgender inmates based solely on genital characteristics rather than gender identity.

99.    The Prison Rape Elimination Act (PREA) implementing regulations specifically provides that lockup facilities **"shall not search or physically examine a transgender or intersex inmate for the sole purpose of determining the inmate's genital status."** 28 CFR § 115.15(e).

100.    According to Texas Administrative Code § 271.1(a)(6) "female inmates shall be separated by sight and sound from male inmates." Plaintiff is legally female; thus, she should have been separated by sight and sound from male inmates. Additionally, Texas Administrative Code § 271.4, requires a documented appeals process for classification assessments, reassessments, and housing. No appeals process was made available to Plaintiff, regardless of her so pleading for such relief.

101.    The Dallas County Sheriff's Department General Orders/Code of Conduct Vol. I Chapter 11.2 provides the regulations for the treatment of transgender detainees.[1] The General Rules/Code of Conduct § VII(4) prohibits searches for the sole purpose of determining genital status, as occurred here.[2]

102.    Defendant Dallas County has failed to properly train and supervise jail staff to treat transgender inmates humanely, such that jail staff refer to transgender inmates by the improper gender pronouns, refer to transgender inmates' genitals and private body parts in offensive manners, alert and announce the fact that transgender inmates are transgender to other inmates and jail staff, force transgender inmates to expose their genitals for the purpose of determining their

---

[1] Dallas County Sheriff's Department General Orders/Code of Conduct Vol. I Chapter 11.2.

[2] Dallas County Sheriff's Department General Orders/Code of Conduct Vol. I Chapter 11.2 § VII(4) 1. ("Transgender/ intersex/ gender nonconforming individuals will not be pat searched, frisk searched or strip searched for the sole purpose of determining their genital status.").

gender, and place transgender inmates based solely on genital characteristics rather than gender identity.

103.   As a result of the above actions, Ms. Jackson has suffered trauma and felt demoralized, anxious, stressed, a loss of dignity, and fear.

104.   Defendants were at all times acting under the color of law.

105.   Dallas County had a policy or custom of promoting and/or tolerating genital searches to determine gender identity and placement of inmates based off of genitalia rather than the gender with which they identify when confronted with a transgender inmate in the Dallas County jail. This classification of transgender inmates based on their genitals rather than gender identity, is demonstrated by the unconstitutionally invasive search of Plaintiff by Dallas County Employees and a pattern of similar incidents of classification of Plaintiff based on her genitals rather than her gender identity that she experienced three different times inside of the Dallas County jail.

106.   This pattern and practice is further shown by a similar incident involving a transgender female, C.W.,[3] at the Dallas County Jail in 2013. When C.W. was being booked into the Dallas County Jail, she was asked if she was a "real female" and if she had a "working vagina." The officer laughed at C.W. and told other officers that they should have frisked her a little closer as the other officers laughed. Three male officers then took C.W. into a room to "change her out." They forced her to undress, spread her buttocks, show the bottom of her feet, and then put on male jail attire. The jail then began processing C.W. as a male, which caused her to remain in custody for another fourteen hours since they had to restart the booking process after she had already been processed as a female. C.W. was then taken to the male area of the jail where she was verbally

_____
[3] C.W. does not wish to be identified at this time; therefore, her initials have been used in place of her name.

harassed and embarrassed by inmates and guards in the same manner that Ms. Jackson was during her incarceration in the Dallas County Jail.

107.    Additionally, the constitutional violations in this case were the direct result of the policy, custom and practice and general atmosphere within the Dallas County Sheriff's Office and Dallas County jail, both of which are under the umbrella of the Defendant Dallas County.

108.    Dallas County's policy of tolerating its employees' use of unconstitutional genital searches to determine gender identity and classifications based on genitalia rather than that of gender status was the moving force behind the violation of Plaintiff's constitutional rights. The reprehensible conduct and inhumane treatment of Plaintiff was a result of the custom, policy, practice and/or procedure of Dallas County.

109.    At the time of the incident, the County employees were acting pursuant to a custom, policy, practice and/or procedure of the Dallas County Sheriff's Office. The actions of Dallas County employees violated the well-settled right to be free from unreasonable and unnecessary searches under the Fourth and Fourteenth Amendments to the United States Constitution.

110.    Before this incident, Defendant Dallas County developed and maintained a policy, custom or practice that was the moving force behind the constitutional and civil right violations and the injuries suffered by Plaintiff in violation of the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983. Specifically, the Dallas County Sheriff's Office had a policy, custom, or practice of tolerating the use of genital searches to determine gender identity and placement of inmates based off of genitalia rather than the gender with which they identify; the inadequacy of investigations into incidents reported to superiors such as Captain Shelley Knight; the lack of discipline for incidents of unconstitutional searches and placements described above; and the lack

of supervision and reporting procedures to monitor the use of unconstitutional searches and placements by Dallas County employees.

111.    But for these acts and omissions of policy, custom, training, and discipline, Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution would not have been violated.

112.    As a direct result of these acts, Plaintiff has suffered mental/emotional injuries and economic damages. She was deprived of her constitutional rights, all to her damage.

113.    Based on the above, Dallas County bears responsibility for this incident. Upon information and belief, the policy, custom, and practice of Defendant Dallas County was to perform unconstitutional genital searches to determine gender identity and place inmates based off of genitalia rather than the gender with which they identify. Defendant Dallas County was also aware that its officers would be likely to encounter the same or similar situations as this and that the subjects' civil rights would be violated. Despite that awareness, Defendant Dallas County took no steps to adequately educate or train Dallas County officers on how to handle situations such as this even though the consequences of such practice – severe mental anguish – was known or obvious. As a result, there was a widespread practice within the Dallas County Sheriff's Office to conduct genital searches to determine gender identity and to place inmates based off of genitalia rather than the gender with which they identify when confronted with a transgender inmate in the Dallas County jail. These practices and lack of training were so common and widespread as to constitute a custom that fairly represents the policy of Dallas County, Texas. Dallas County Employees S. Joseph or L. Samuel even stated that this was the policy of Dallas County.

114.    The failure to ensure that written policies were adequately implemented and the implementation and toleration of the above practices, policies and customs, as well as the lack of

adequate training by Dallas County, constitutes deliberate indifference to Plaintiff's constitutional rights. Further, said customs, practices and policies were the moving force, and the direct cause of Plaintiff being unconstitutionally searched and harassed.

115.    It is believed no personnel were ever disciplined in regard to the atrocious treatment to which Ms. Jackson was subjected.

116.    At all material times, all of the Individual Defendants acted under color of law, including statutes, ordinances, regulations, customs and usages of the State of Texas and/or the City of Dallas.

## C.    Argument and Authorities

117.    Government officials are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S.  800, 815-819, 102 S. Ct. 2727, 73 L. Ed.2d 396 (1982). In order to establish that the Individual Defendants are not entitled to qualified immunity, Plaintiff must satisfy a two-part test: "(i) under existing law, does the plaintiff allege a violation of an actual, clearly established statutory or constitutional rights of which a reasonable person would have known; and (ii) if so, was the Defendant's conduct objectively unreasonable in the light of clearly established law at the time of that conduct." *Felton v. Polles*, 315 F.3d 470, 473 (5th Cir. 2002), *abrogated on other grounds* by *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); *Hare v. City of Corinth, Miss*., 135 F.3d 320, 325 (5th Cir. 1998).  Plaintiff will set forth below each Individual Defendant's conduct that is not subject to Qualified Immunity.

**SAMUEL JOSEPH ("S. JOSEPH")**

118.    Dallas County employee S. Joseph deprived Plaintiff of the rights and privileges

secured to her by the Fourth and Fourteenth Amendments to the United States Constitution and by other laws of the United States to be free from illegal and unreasonable searches which violated her right to bodily privacy. S. Joseph violated Ms. Jackson's right to be free from unreasonable searches by performing a strip search on Ms. Jackson for the sole purpose of determining her genital status.

119.   Plaintiff was deprived of the rights and privileges secured to her by the Fourth and Fourteenth Amendments to the United States Constitution and by other laws of the United States to be free from illegal and unreasonable searches which violated her right to bodily privacy.

120.   In a civilized society, one's anatomy is draped with constitutional protections." *United States v. Afanador*, 567 F.2d 1325, 1331 (5th Cir. 1978). It was clearly established that Ms. Jackson retained her constitutional right to bodily privacy while in the Dallas County jail. *Oliver v. Scott*, 276 F.3d 736, 745 (5th Cir. 2002).

121.   The unreasonable search in this case was performed without a warrant, without consent, and without any valid penological reason.

122.   Ms. Jackson did not present a threat, let alone an immediate threat necessitating the involuntary exposure of her genitalia. The unnecessary search was not performed to protect the officers' safety or to effectuate any other legitimate law enforcement purpose.

123.   As a result of the malicious invasion and unconstitutional search and seizure to determine Plaintiff's gender identity, Plaintiff was deprived of her rights to bodily privacy and equal protection of the laws and impeded the due course of justice, in violation of the Fourteenth Amendment of the Constitution of the United States. This cause of action is brought pursuant to 42 U.S.C. § 1983.

124.   The above described actions and omissions deprived Plaintiff of her Constitutional

right to bodily privacy and liberty under the Fourteenth Amendment of the United States Constitution and were an unreasonable and unnecessary invasive search and seizure under the Fourth Amendment of the United States Constitution.

125.    Defendant S. Joseph's actions constitute a violation of Ms. Jackson's well-settled rights to be free from unreasonable strip searches under the Fourth Amendment, actionable under 42 U.S.C. § 1983.[4] Indeed, The Prison Rape Elimination Act expressly prohibits the strip search performed by S. Joseph.  Even Dallas County official written policy prohibits the strip search performed on Ms. Jackson.[5] The fact federal law and Dallas County official written policy expressly prohibit the search in question is strong, if not conclusive evidence that the search was unreasonable.

126.    At the time of the unreasonable strip search of Ms. Jackson, she had a right under the U.S. Constitution to be free from unreasonable searches, and specifically, searches "for the sole purpose of determining the inmate's genital status." U.S. Const. amend. IV; 28 CFR § 115.15(e). The right was clearly established at the time the strip search of Ms. Jackson was performed, and S. Joseph was aware of that right as well. S. Joseph performed an unreasonable

---

[4] *Iskander v. Village of Forest Park*, 690 F.2d 126, 129 (7th Cir.1982) (noting that "even in cases where routine strip searches are justified by legitimate security concerns, they nevertheless 'must be conducted in a reasonable manner.'" and that all searches must be comport "with the reasonableness requirement imposed on all searches under the Fourth Amendment…."); *U.S. v. Cameron*, 538 F.2d 254, 258 (9th Cir.1976) ("[A]ny body search, if it is to comport with the reasonableness standard of the fourth amendment, must be conducted with regard for the subject's privacy and be designed to minimize emotional and physical trauma" and would include "reasonable steps to mitigate the anxiety, discomfort, and humiliation that the suspect may suffer"); *Cf. Evans v. Stephens*, 407 F.3d 1272 (11th Cir.2005) (holding no case law on point was needed to establish search was unreasonable, as Fourth Amendment itself requires reasonableness and the violation was obvious). "Of course, in an obvious case, [general] standards can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S.Ct. 596 (2004).

[5] Dallas County Sheriff's Department General Orders/Code of Conduct Vol. I Chapter 11.2 § VII(4)1 ("Transgender/ intersex/ gender nonconforming individuals will not be pat searched, frisk searched or strip searched for the sole purpose of determining their genital status.").

strip search of Ms. Jackson for the sole purpose of determining the inmate's genital status" which is prohibited by official written policy and the Prison Rape Elimination Act, thereby violating Ms. Jackson's rights under the U.S. Constitution, including but not limited to, the Fourth Amendment thereto. S. Joseph knew or reasonably should have known that performing a strip search "for the sole purpose of determining the inmate's genital status" would violate clearly established law. S. Joseph's actions were a proximate cause of Plaintiff's damages.

127.    Plaintiff asserts that S. Joseph is not entitled to qualified immunity, as the conduct was not objectively reasonable in light of the law clearly established at the time of the unreasonable strip search performed on Ms. Jackson. Ms. Jackson's damages were a foreseeable event. Those damages were directly and proximately caused by Defendant S. Joseph's deliberate indifference towards Ms. Jackson's constitutional rights.

128.    It was well-established law, well before the events at issue in this case, that every citizen of the United States has a clearly defined constitutional right to bodily privacy and to be free from an unlawful search by law enforcement officials in accordance with the Fourth and Fourteenth Amendments to the United States Constitution. No reasonable government official would have acted as Defendant S. Joseph did under these circumstances, wantonly violating written policies and federal law, and thereby violating Ms. Jackson's civil rights by conducting genital searches to determine gender identity.

129.    The strip search of Ms. Jackson represents conduct that was unnecessary, unwarranted, and objectively unreasonable. Defendant is not, therefore, entitled to the protection of qualified immunity.

## LIZYAMMA SAMUEL ("L. SAMUEL")

130.    Dallas County employee L. Samuel deprived Plaintiff of the rights and privileges

secured to her by the Fourth and Fourteenth Amendments to the United States Constitution and by other laws of the United States to be free from illegal and unreasonable searches which violated her right to bodily privacy. L. Samuel violated Ms. Jackson's right to be free from unreasonable searches by performing a strip search on Ms. Jackson for the sole purpose of determining her genital status.

131.    In a civilized society, one's anatomy is draped with constitutional protections." *United States v. Afanador*, 567 F.2d 1325, 1331 (5th Cir. 1978). It was clearly established that Ms. Jackson retained her constitutional right to bodily privacy while in the Dallas County jail. *Oliver v. Scott*, 276 F.3d 736, 745 (5th Cir. 2002).

132.    The unreasonable search in this case was performed without a warrant, without consent, and without any valid penological reason.

133.    Ms. Jackson did not present a threat, let alone an immediate threat necessitating the involuntary exposure of her genitalia. The unnecessary search was not performed to protect the officers' safety or to effectuate any other legitimate law enforcement purpose.

134.    As a result of the malicious invasion and unconstitutional search and seizure to determine Plaintiff's gender identity, Plaintiff was deprived of her rights to bodily privacy and equal protection of the laws and impeded the due course of justice, in violation of the Fourteenth Amendment of the Constitution of the United States. This cause of action is brought pursuant to 42 U.S.C. § 1983.

135.    The above described actions and omissions deprived Plaintiff of her Constitutional right to bodily privacy and liberty under the Fourteenth Amendment of the United States Constitution and were an unreasonable and unnecessary invasive search and seizure under the Fourth Amendment of the United States Constitution.

136.    Defendant L. Samuel's actions constitute a violation of Ms. Jackson's well-settled rights to be free from unreasonable strip searches under the Fourth Amendment, actionable under 42 U.S.C. § 1983.[6] Indeed, The Prison Rape Elimination Act expressly prohibits the strip search performed by L. Samuel. Even Dallas County official written policy prohibits the strip search performed on Ms. Jackson.[7] The fact federal law and Dallas County official written policy expressly prohibit the search in question is strong, if not conclusive evidence that the search was unreasonable.

137.    At the time of the unreasonable strip search of Ms. Jackson, she had a right under the U.S. Constitution to be free from unreasonable searches, and specifically, searches "for the sole purpose of determining the inmate's genital status." U.S. Const. amend. IV; 28 CFR § 115.15(e). The right was clearly established at the time the strip search of Ms. Jackson was performed, and L. Samuel was aware of that right as well. L. Samuel performed an unreasonable strip search of Ms. Jackson for the sole purpose of determining the inmate's genital status" which is prohibited by official written policy and the Prison Rape Elimination Act, thereby violating Ms. Jackson's rights under the U.S. Constitution, including but not limited to, the Fourth Amendment

---

[6] *Iskander v. Village of Forest Park*, 690 F.2d 126, 129 (7th Cir.1982) (noting that "even in cases where routine strip searches are justified by legitimate security concerns, they nevertheless 'must be conducted in a reasonable manner.'" and that all searches must be comport "with the reasonableness requirement imposed on all searches under the Fourth Amendment…."); *U.S. v. Cameron*, 538 F.2d 254, 258 (9th Cir.1976) ("[A]ny body search, if it is to comport with the reasonableness standard of the fourth amendment, must be conducted with regard for the subject's privacy and be designed to minimize emotional and physical trauma" and would include "reasonable steps to mitigate the anxiety, discomfort, and humiliation that the suspect may suffer"); *Cf. Evans v. Stephens*, 407 F.3d 1272 (11th Cir.2005) (holding no case law on point was needed to establish search was unreasonable, as Fourth Amendment itself requires reasonableness and the violation was obvious). "Of course, in an obvious case, [general] standards can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S.Ct. 596 (2004).

[7] Dallas County Sheriff's Department General Orders/Code of Conduct Vol. I Chapter 11.2 § VII(4)1 ("Transgender/ intersex/ gender nonconforming individuals will not be pat searched, frisk searched or strip searched for the sole purpose of determining their genital status.").

thereto. L. Samuel knew or reasonably should have known that performing a strip search "for the sole purpose of determining the inmate's genital status" would violate clearly established law.

138.    Plaintiff asserts that L. Samuel is not entitled to qualified immunity, as the conduct was not objectively reasonable in light of the law clearly established at the time of the unreasonable strip search performed on Ms. Jackson. Ms. Jackson's damages were a foreseeable event. Those damages were directly and proximately caused by Defendant L. Samuel's deliberate indifference towards Ms. Jackson's constitutional rights.

139.    It was well-established law, well before the events at issue in this case, that every citizen of the United States has a clearly defined constitutional right to bodily privacy and to be free from an unlawful search by law enforcement officials in accordance with the Fourth and Fourteenth Amendments to the United States Constitution. In fact, the Fourth Amendment right to be free from unreasonable strip searches has been confirmed on multiple occasions. *Iskander v. Village of Forest Park*, 690 F.2d 126, 129 (7th Cir.1982) (noting that "even in cases where routine strip searches are justified by legitimate security concerns, they nevertheless 'must be conducted in a reasonable manner.'" and that all searches must be comport "with the reasonableness requirement imposed on all searches under the Fourth Amendment…."); U.*S. v. Cameron*, 538 F.2d 254, 258 (9th Cir.1976) ("[A]ny body search, if it is to comport with the reasonableness standard of the fourth amendment, must be conducted with regard for the subject's privacy and be designed to minimize emotional and physical trauma" and would include "reasonable steps to mitigate the anxiety, discomfort, and humiliation that the suspect may suffer"); *Cf. Evans v. Stephens*, 407 F.3d 1272 (11th Cir.2005) (holding no case law on point was needed to establish search was unreasonable, as Fourth Amendment itself requires reasonableness and the violation

was obvious).[8]

140.    No reasonable government official would have acted as Defendant L. Samuel did under these circumstances, wantonly violating written policies and federal law, and thereby violating Ms. Jackson's civil rights by conducting genital searches to determine gender identity.

141.    The strip search of Ms. Jackson represents conduct that was unnecessary, unwarranted, and objectively unreasonable. Defendant is not, therefore, entitled to the protection of qualified immunity.

**UNKNOWN DALLAS COUNTY EMPLOYEE III**

142.    Unknown Dallas County Employee III deprived Plaintiff of the rights and privileges secured to her by the Fourth and Fourteenth Amendments to the United States Constitution and by other laws of the United States to be free from illegal and unreasonable searches which violated her right to bodily privacy. Unknown Dallas County Employee III violated Ms. Jackson's right to be free from unreasonable searches by performing a strip search on Ms. Jackson for the sole purpose of determining her genital status.

143.    In a civilized society, one's anatomy is draped with constitutional protections." *United States v. Afanador*, 567 F.2d 1325, 1331 (5th Cir. 1978). It was clearly established that Ms. Jackson retained her constitutional right to bodily privacy while in the Dallas County jail. *Oliver v. Scott*, 276 F.3d 736, 745 (5th Cir. 2002).

144.    The unreasonable search in this case was performed without a warrant, without consent, and without any valid penological reason.

145.    Ms. Jackson did not present a threat, let alone an immediate threat necessitating the

---

[8] "Of course, in an obvious case, [general] standards can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S.Ct. 596 (2004).

involuntary exposure of her genitalia. The unnecessary search was not performed to protect the officers' safety or to effectuate any other legitimate law enforcement purpose.

146.     As a result of the malicious invasion and unconstitutional search and seizure to determine Plaintiff's gender identity, Plaintiff was deprived of her rights to bodily privacy and equal protection of the laws and impeded the due course of justice, in violation of the Fourteenth Amendment of the Constitution of the United States. This cause of action is brought pursuant to 42 U.S.C. § 1983.

147.     The above described actions and omissions deprived Plaintiff of her Constitutional right to bodily privacy and liberty under the Fourteenth Amendment of the United States Constitution and were an unreasonable and unnecessary invasive search and seizure under the Fourth Amendment of the United States Constitution.

148.     Defendant Unknown Dallas County Employee III's actions constitute a violation of Ms. Jackson's well-settled rights to be free from unreasonable strip searches under the Fourth Amendment, actionable under 42 U.S.C. § 1983.[9] Indeed, The Prison Rape Elimination Act expressly prohibits the strip search performed by Unknown Dallas County Employee III. Even

---

[9] *Iskander v. Village of Forest Park*, 690 F.2d 126, 129 (7th Cir.1982) (noting that "even in cases where routine strip searches are justified by legitimate security concerns, they nevertheless 'must be conducted in a reasonable manner.'" and that all searches must be comport "with the reasonableness requirement imposed on all searches under the Fourth Amendment…."); *U.S. v. Cameron*, 538 F.2d 254, 258 (9th Cir.1976) ("[A]ny body search, if it is to comport with the reasonableness standard of the fourth amendment, must be conducted with regard for the subject's privacy and be designed to minimize emotional and physical trauma" and would include "reasonable steps to mitigate the anxiety, discomfort, and humiliation that the suspect may suffer"); *Cf. Evans v. Stephens*, 407 F.3d 1272 (11th Cir.2005) (holding no case law on point was needed to establish search was unreasonable, as Fourth Amendment itself requires reasonableness and the violation was obvious). "Of course, in an obvious case, [general] standards can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S.Ct. 596 (2004).

Dallas County official written policy prohibits the strip search performed on Ms. Jackson.[10] The fact federal law and Dallas County official written policy expressly prohibit the search in question is strong, if not conclusive evidence that the search was unreasonable.

149.     At the time of the unreasonable strip search of Ms. Jackson, she had a right under the U.S. Constitution to be free from unreasonable searches, and specifically, searches "for the sole purpose of determining the inmate's genital status." U.S. Const. amend. IV; 28 CFR § 115.15(e). The right was clearly established at the time the strip search of Ms. Jackson was performed, and Unknown Dallas County Employee III was aware of that right as well. Unknown Dallas County Employee III performed an unreasonable strip search of Ms. Jackson for the sole purpose of determining the inmate's genital status" which is prohibited by official written policy and the Prison Rape Elimination Act, thereby violating Ms. Jackson's rights under the U.S. Constitution, including but not limited to, the Fourth Amendment thereto. L. Samuel knew or reasonably should have known that performing a strip search "for the sole purpose of determining the inmate's genital status" would violate clearly established law. Unknown Dallas County Employee III's actions were a proximate cause of Plaintiff's damages.

150.     Plaintiff asserts that Unknown Dallas County Employee III is not entitled to qualified immunity, as the conduct was not objectively reasonable in light of the law clearly established at the time of the unreasonable strip search performed on Ms. Jackson. Ms. Jackson's damages were a foreseeable event. Those damages were directly and proximately caused by Defendant Unknown Dallas County Employee III's deliberate indifference towards Ms. Jackson's constitutional rights.

---

[10] Dallas County Sheriff's Department General Orders/Code of Conduct Vol. I Chapter 11.2 § VII(4)I ("Transgender/ intersex/ gender nonconforming individuals will not be pat searched, frisk searched or strip searched for the sole purpose of determining their genital status.").

151.   It was well-established law, well before the events at issue in this case, that every citizen of the United States has a clearly defined constitutional right to bodily privacy and to be free from an unlawful search by law enforcement officials in accordance with the Fourth and Fourteenth Amendments to the United States Constitution. No reasonable government official would have acted as Defendant Unknown Dallas County Employee III did under these circumstances, wantonly violating written policies and federal law, and thereby violating Ms. Jackson's civil rights by conducting genital searches to determine gender identity.

152.   The strip search of Ms. Jackson represents conduct that was unnecessary, unwarranted, and objectively unreasonable. Defendant is not, therefore, entitled to the protection of qualified immunity.

**SHERIFF LUPE VALDEZ**

153.   Sheriff Lupe Valdez deprived Plaintiff of the rights and privileges secured to her by the Fourth and Fourteenth Amendments to the United States Constitution and by other laws of the United States to be free from illegal and unreasonable searches which violated her right to bodily privacy. S. Joseph, L. Samuel, and Unknown Dallas County Employee III violated Ms. Jackson's right to be free from unreasonable searches by performing a strip search on Ms. Jackson for the sole purpose of determining her genital status. This search was, in part, the result of a failure to provide proper training and supervision by Sheriff Lupe Valdez.

The right to be free from illegal and unreasonable searches was clearly established when the unreasonable strip search of Ms. Jackson occurred.[11] Further, it was clearly established that

---

[11] *Iskander v. Village of Forest Park*, 690 F.2d 126, 129 (7th Cir.1982) (noting that "even in cases where routine strip searches are justified by legitimate security concerns, they nevertheless 'must be conducted in a reasonable manner.'" and that all searches must be comport "with the reasonableness requirement imposed on all searches under the Fourth Amendment…."); U.S. *v. Cameron*, 538 F.2d 254, 258 (9th Cir.1976) ("[A]ny body search, if it is to comport with the reasonableness standard of the fourth amendment, must be conducted with regard for the subject's privacy and be designed to minimize emotional

Ms. Jackson retained her constitutional right to bodily privacy while in the Dallas County jail. *Oliver v. Scott*, 276 F.3d 736, 745 (5th Cir. 2002). Indeed, "[i] a civilized society, one's anatomy is draped with constitutional protections." *United States v. Afanador*, 567 F.2d 1325, 1331 (5th Cir. 1978). It was clearly established that Ms. Jackson retained her constitutional right to bodily privacy while in the Dallas County jail. *Oliver v. Scott*, 276 F.3d 736, 745 (5th Cir. 2002).

154.    The unreasonable search in this case was performed without a warrant, without consent, and without any valid penological reason.

155.    Ms. Jackson did not present a threat, let alone an immediate threat necessitating the involuntary exposure of her genitalia. The unnecessary search was not performed to protect the officers' safety or to effectuate any other legitimate law enforcement purpose.

156.    The unconstitutional search to "observe" Plaintiff's genitals and allegedly to "determine" her gender and the harassment that accompanied her incarceration was objectively unreasonable as it violated Dallas County Sheriff's Office written policy and violated Plaintiff's rights under the Fourth and Fourteenth Amendment of the United States Constitution, and the Prison Rape Elimination Act.

157.    However, the written policy was essentially overridden or deemed a nullity due to the actual conduct and performance of observing and searching a person's genitals when that person is believed or known to be transgender for the sole purpose of making a placement decision and ostensibly "determining" the person's gender. This conduct was so common and widespread as to constitute a custom and practice that fairly represents the policy of Dallas County, Texas

---

and physical trauma" and would include "reasonable steps to mitigate the anxiety, discomfort, and humiliation that the suspect may suffer"); *Cf. Evans v. Stephens*, 407 F.3d 1272 (11th Cir.2005) (holding no case law on point was needed to establish search was unreasonable, as Fourth Amendment itself requires reasonableness and the violation was obvious). "Of course, in an obvious case, [general] standards can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S.Ct. 596 (2004).

implemented and continued by Sheriff Lupe Valdez and her failure to properly train and supervise her subordinates.

158.    Defendant Sheriff Lupe Valdez implemented and maintained a policy, custom, and practice of classifying transgender inmates based exclusively on genital characteristics rather than their gender identity without any individualized determination of what would be safest, or in the alternative, Sheriff Lupe Valdez failed to properly train and supervise jail staff to follow policy and practice prohibiting the classification of transgender inmates based solely on genital characteristics rather than gender identity.

159.    The Prison Rape Elimination Act (PREA) implementing regulations specifically provides that lockup facilities "shall not search or physically examine a transgender or intersex inmate for the sole purpose of determining the inmate's genital status." 28 CFR § 115.15(e).

160.    According to Texas Administrative Code § 271.1(a)(6) "female inmates shall be separated by sight and sound from male inmates." Plaintiff is legally female; thus, she should have been separated by sight and sound from male inmates. Additionally, Texas Administrative Code § 271.4, requires a documented appeals process for classification assessments, reassessments, and housing. No appeals process was made available to Plaintiff, regardless of her so pleading for such relief.

161.    The Dallas County Sheriff's Department General Orders/Code of Conduct Vol. I Chapter 11.2 provides the regulations for the treatment of transgender detainees.[12] The General Rules/Code of Conduct § VII(4) prohibits searches for the sole purpose of determining genital

---

[12] Dallas County Sheriff's Department General Orders/Code of Conduct Vol. I Chapter 11.2.

status, as occurred here.[13]

162.    In violation of the above statutory and regulatory authorities, Ms. Jackson was placed with the male population of detainees on three separate occasions, rather with than the female population to which she legally belongs.

163.    Sheriff Lupe Valdez failed to properly train and supervise jail staff to treat transgender inmates humanely, such that jail staff refer to transgender inmates by the improper gender pronouns, refer to transgender inmates' genitals and private body parts in offensive manners, alert and announce the fact that transgender inmates are transgender to other inmates and jail staff, force transgender inmates to expose their genitals for the purpose of determining their gender, and place transgender inmates based solely on genital characteristics rather than gender identity. The failure to properly train and supervise the detention personnel is clearly evidence by the fact the personnel declared that the treatment to which Ms. Jackson was subjected was the official policy of Sheriff Lupe Valdez.

164.    As a result of the malicious invasion and unconstitutional search and seizure to determine Plaintiff's gender identity, and the placement with the detainee population of the opposite legal gender, Plaintiff was deprived of her rights to bodily privacy and liberty, the equal protection of the law, and the due course of justice, in violation of the Fourteenth Amendment of the Constitution of the United States. Her rights under the Prison Rape Elimination Act to not be strip searched or physically examined for the sole purpose of determining her genital status were also violated. 28 CFR § 115.15(e).

165.    Defendant Sheriff Lupe Valdez's failure to train and failure to supervise detention

---

[13] Dallas County Sheriff's Department General Orders/Code of Conduct Vol. I Chapter 11.2 § VII(4) 1. ("Transgender/ intersex/ gender nonconforming individuals will not be pat searched, frisk searched or strip searched for the sole purpose of determining their genital status.").

staff and the resulting actions of the detention staff constitute violations of Ms. Jackson's well-settled rights to be free from unreasonable strip searches under the Fourth Amendment, actionable under 42 U.S.C. § 1983. Indeed, The Prison Rape Elimination Act expressly prohibits the strip search performed on Plaintiff. Even Dallas County official written policy prohibits the strip search performed on Ms. Jackson.[14] The fact federal law and Dallas County official written policy expressly prohibit the search in question is strong, if not conclusive evidence that the search was unreasonable.

166.    At the time of the unreasonable strip search of Ms. Jackson, she had a right under the U.S. Constitution to be free from unreasonable searches, and specifically, searches "for the sole purpose of determining the inmate's genital status." U.S. Const. amend. IV; 28 CFR § 115.15(e). The right was clearly established at the time the strip search of Ms. Jackson was performed, and Sheriff Lupe Valdez was aware of that right as well. Sheriff Lupe Valdez failure to train and supervise the other Individual Defendants allowed for an unreasonable strip search of Ms. Jackson for the sole purpose of determining the inmate's genital status, which is prohibited by official written policy and the Prison Rape Elimination Act, thereby violating Ms. Jackson's rights under the U.S. Constitution, including but not limited to, the Fourth Amendment thereto. Sheriff Lupe Valdez knew or reasonably should have known that performing a strip search "for the sole purpose of determining the inmate's genital status" would violate clearly established law. Sheriff Lupe Valdez failure to train and failure to supervise the detention staff were proximate causes of Plaintiff's damages.

167.    Plaintiff asserts that Sheriff Lupe Valdez is not entitled to qualified immunity, as

---

[14] Dallas County Sheriff's Department General Orders/Code of Conduct Vol. I Chapter 11.2 § VII(4)1 ("Transgender/ intersex/ gender nonconforming individuals will not be pat searched, frisk searched or strip searched for the sole purpose of determining their genital status.").

the failure to train and failure to supervise, as well as the resulting violations of Plaintiff's constitutional rights, were not objectively reasonable in light of the law clearly established at the time of the unreasonable strip search performed on Ms. Jackson and her placement with the detainee population of the opposite legal gender. Ms. Jackson's damages were a foreseeable event. Those damages were directly and proximately caused by Sheriff Lupe Valdez's deliberate indifference towards Ms. Jackson's constitutional rights.

168.    It was well-established law, well before the events at issue in this case, that every citizen of the United States has a clearly defined constitutional right to bodily privacy and to be free from an unlawful search by law enforcement officials in accordance with the Fourth and Fourteenth Amendments to the United States Constitution. No reasonable government official would have acted as Sheriff Lupe Valdez did under these circumstances, permitting the wanton violation of written policies and federal law, and thereby violating Ms. Jackson's civil rights by way of an unreasonable genital searches to determine gender identity.

169.    The strip search of Ms. Jackson and her placement with the male detainee population represent conduct that was unnecessary, unwarranted, and objectively unreasonable. Defendant is not, therefore, entitled to the protection of qualified immunity.

170.    The above described actions and omissions deprived Plaintiff of her clearly established Constitutional rights to bodily privacy and liberty, and to be free from unreasonable searches under the Fourth and Fourteenth Amendments of the United States Constitution.

**MARIAN BROWN**

171.    It was clearly established that Ms. Jackson retained her constitutional right to bodily privacy while in the Dallas County jail. *Oliver v. Scott*, 276 F.3d 736, 745 (5th Cir. 2002). Indeed, "[i] a civilized society, one's anatomy is draped with constitutional protections." *United States v.*

*Afanador*, 567 F.2d 1325, 1331 (5th Cir. 1978). It was clearly established that Ms. Jackson retained her constitutional right to bodily privacy while in the Dallas County jail. *Oliver v. Scott*, 276 F.3d 736, 745 (5th Cir. 2002).

172.    Defendant Sheriff Marian Brown maintained a policy, custom, and practice of classifying transgender inmates based exclusively on genital characteristics rather than their gender identity without any individualized determination of what would be safest, or in the alternative, Sheriff Marian Brown failed to properly train and supervise jail staff to follow policy and practice prohibiting the classification of transgender inmates based solely on genital characteristics rather than gender identity.

173.    According to Texas Administrative Code § 271.1(a)(6) "female inmates shall be separated by sight and sound from male inmates." Plaintiff is legally female; thus, she should have been separated by sight and sound from male inmates. Additionally, Texas Administrative Code § 271.4, requires a documented appeals process for classification assessments, reassessments, and housing. No appeals process was made available to Plaintiff, regardless of her so pleading for such relief.

174.    The Dallas County Sheriff's Department General Orders/Code of Conduct Vol. I Chapter 11.2 provides the regulations for the treatment of transgender detainees.[15]

175.    In violation of the above authorities, Ms. Jackson was placed with the male population of detainees on three separate occasions, rather with than the female population to which she legally belongs.

176.    Sheriff Marian Brown failed to properly train and supervise jail staff to treat transgender inmates humanely, such that jail staff refer to transgender inmates by the improper

---

[15] Dallas County Sheriff's Department General Orders/Code of Conduct Vol. I Chapter 11.2.

gender pronouns, refer to transgender inmates' genitals and private body parts in offensive manners, alert and announce the fact that transgender inmates are transgender to other inmates and jail staff, force transgender inmates to expose their genitals for the purpose of determining their gender, and place transgender inmates based solely on genital characteristics rather than gender identity. The failure to properly train and supervise the detention personnel is clearly evidence by the fact she was repeatedly placed with the male population on multiple occasions stretching over many months.

177.    As a result of the placement with the detainee population of the opposite legal gender, Plaintiff was deprived of her rights to bodily privacy and liberty, the equal protection of the law, and the due course of justice, in violation of the Fourteenth Amendment of the Constitution of the United States.

178.    Plaintiff asserts that Sheriff Marian Brown is not entitled to qualified immunity, as the failure to train and failure to supervise, as well as the resulting violations of Plaintiff's constitutional rights, were not objectively reasonable in light of the law clearly established at the time of her placement with the detainee population of the opposite legal gender. Ms. Jackson's damages were a foreseeable event. Those damages were directly and proximately caused by Sheriff Marian Brown's deliberate indifference towards Ms. Jackson's constitutional rights.

179.    It was well-established law, before the events at issue in this case, that every citizen of the United States has a clearly defined constitutional right to bodily privacy in accordance with the Fourth and Fourteenth Amendments to the United States Constitution. No reasonable government official would have acted as Sheriff Marian Brown did under these circumstances, permitting the wanton violation of written policies and federal law, and thereby violating Ms. Jackson's civil rights.

180.    The placement of Ms. Jackson with the male detainee population represents conduct that was unnecessary, unwarranted, and objectively unreasonable. Defendant is not, therefore, entitled to the protection of qualified immunity.

### D.    Prayer

181.    WHEREFORE, PREMISES CONSIDERED, Plaintiff respectively asks the Court to overrule Defendants' request to dismiss Plaintiff's claims based on Qualified Immunity, and for such other and further relief to which he may be entitled, general or special, at law or in equity.

Respectfully submitted,

/s/ Scott H. Palmer
SCOTT H. PALMER
State Bar No. 00797196
JAMES P. ROBERTS
State Bar No. 24105721

SCOTT H. PALMER, P.C.
15455 Dallas Parkway,
Suite 540, LB 32
Dallas, Texas 75001
Tel: (214) 987-4100
Fax: (214) 922-9900
scott@scottpalmerlaw.com
james@scottpalmerlaw.com

ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and correct copy of the foregoing document was forwarded to all counsel of record, in a manner authorized by Rule 5, of the Federal Rules of Civil Procedure, on March 12, 2020.

<u>*/s/Scott H. Palmer*                      </u>
SCOTT H. PALMER